EDWARD P. ATKINSON, trustee, *vs.* MARLA F. ROSENTHAL & another.[1]

No. 91-P-369.

Suffolk. April 16, 1992. - August 25, 1992.

Present: KASS, JACOBS, & GILLERMAN, JJ.

*Landlord and Tenant*, Surrender, Termination of lessee's obligation, Rent. *Damages*, Mitigation. *Practice, Civil*, Findings by judge. *Consumer Protection Act*, Unfair act or practice, Businessman's claim.

The record of an action for damages for breach of a commercial lease did not establish that the landlord, by finding a new tenant, accepted the former tenants' surrender of the lease, and the former tenants were responsible for rental payments due under the lease during the period the premises were vacant as well as for losses the landlord sustained after reletting the premises. [221-222]

The record of an action for damages for breach of a commercial lease did not support the judge's findings, with the result that the judge was to reexamine the issue of damages the landlord sustained upon reletting the premises. [223-225]

A failure to perform obligations under a written commercial lease, even though deliberate and for reasons of self-interest, did not form a basis for asserting a claim under G. L. c. 93A, the Consumer Protection Act, where there was no consistent pattern of breach of contract being used to obtain advantage for the party committing the breach in relation to the other party. [225-226]

CIVIL ACTION commenced in the Boston Municipal Court Department on February 2, 1989.

The case was heard by *Richard J. Chin*, J.

*Timothy H. White* for the plaintiff.

*Paul F. Denver* for the defendants.

KASS, J. Twenty-two months before the expiration of a written five-year lease, the tenants, Marla F. Rosenthal and Terri E. Leone, abandoned the leased premises. We are con-

[1]Terri E. Leone.

cerned with the damages owed by them for breach of the lease. A judge of the Boston Municipal Court ruled that the landlord, because he had successfully relet the premises, was not entitled to any damages. The landlord appealed to the Appellate Division of the Boston Municipal Court, which decided that there was no error and dismissed the report. See G. L. c. 231, § 108; Dist./Mun.R.Civ.P. 64 (1975). Thereupon, the landlord exercised his further right of appeal to us conferred by G. L. c. 231, § 109. We are of opinion that the landlord established certain damages and reverse the order of the Appellate Division.

These are the facts as found by the Municipal Court judge, supplemented with certain undisputed material in the record. Leone and Rosenthal entered into a written lease with the landlord[2] for 1,500 feet of space in the basement level of 7 Liberty Square in Boston, in which they proposed to operate a printing and copying business. That lease provided for a term beginning November 1, 1985, and ending October 31, 1990. Rent began at $1,250 per month and climbed as the lease term progressed, so that during the final two years of the lease rent was $3,000 per month. As additional rent, the tenants were to pay thirteen percent of increases in real estate taxes and operating expenses over designated base years.

The tenants did, indeed, open and for three years operated a printing and copying shop under the business name, Bostonian Press. By letter dated November 23, 1988, the tenants notified the landlord of their intention "to terminate said Lease and to vacate the premises on or before January 15, 1989." They had entered into a new lease in East Boston for twice the space at half the rent. In their notice to their landlord, the tenants referred to "various concerns and problems

_____

[2]On the date the lease was signed, September 24, 1985, Edward P. Atkinson and Brenda Koskinen, were owners of 7 Liberty Square and were the landlord under the lease. The property was conveyed to Edward P. Atkinson, trustee of ANKKA Realty Trust I under a declaration of trust dated October 30, 1987. The trust acquired the lessor's rights under the lease, and, in this opinion, we refer to Atkinson or the trust as the landlord.

which have affected our 'right of quiet enjoyment.' " Their grievances had to do with inadequate air conditioning and disrupted elevator service. The trial judge correctly found that the tenants had not established grounds for constructive eviction, see *Hamilton* v. *Transportation Mgmt. Corp.*, 10 Mass. App. Ct. 927 (1980), and the tenants, appropriately, have not pressed the point in the appellate phases.

On the same day that he received the notice from his tenants, December 1, 1988, the landlord fired back a letter saying he did not consent to termination of the lease. "I remind you," the landlord added, "that under the terms of our lease, you are responsible for all rental payments through the end of the lease term. If you vacate the premises prior to the end of the lease term, you will be liable for all costs and commissions associated with re-leasing the space, and for the difference, if any, in rental amounts."

After the tenants vacated their space, the landlord succeeded in negotiating the lease of that space to a new tenant, Rainbow Rollers, Inc., which was taking space on the street floor to operate a restaurant and, to meet certain regulatory requirements, needed the basement space which the tenants had abandoned. The new lease was signed March 31, 1989, and provided for a commencement date of April 1, 1989.

1. *Whether surrender of the lease was accepted?* Both the trial judge and the Appellate Division, in affirming his decision, proceeded on the basis of a conclusion that the landlord, by taking steps to find a new tenant for the vacated premises, accepted the tenants' surrender of the lease. We know that the landlord did not expressly accept a surrender of the lease; to the contrary, he expressly rebuffed the tenants' surrender. Acceptance of surrender of a lease may come about inferentially if a landlord exercises control over the property, usually by physical steps such as changing locks or altering the premises in a fashion inconsistent with resumption of the original tenancy. See *Guaranty Bank & Trust Co.* v. *Mid-State Ins. Agency, Inc.*, 383 Mass. 319, 322 (1981). Substituting a new tenant may be taken as an acceptance of a surrender of a lease. *Scalesse* v. *Siegel*, 5 Mass. App. Ct. 784

(1977). Contrast *Cantor* v. *Van Noorden Co.*, 4 Mass. App. Ct. 819 (1976).

A landlord may choose precisely that course adopted by the landlord in this case, viz., to decline the surrender but to notify the tenant that the landlord would seek to rent the premises, in effect for the tenant's account. When a landlord takes such an action, an inference of acceptance of surrender is not to be made and the obligation of the tenant to pay rent does not end, although it is reduced by such rental income as the landlord takes in from the new tenant, less expenses of releasing. Restatement (Second) of Property, Landlord and Tenant § 12.1 comment i (1977).

Such a course of conduct was foreseen in the lease which in this case governs the rights of the parties. That lease provided that in the event of a default by the tenant, "the Lessor shall have the right thereafter, while such default continues, to re-enter and take complete possession of the leased premises, to declare the term of this lease ended, and remove the LESSEE's effects. . . . The LESSEE shall indemnify the LESSOR against all loss of rents and other payments which the LESSOR may incur by reason of such termination during the residue of the term." Conduct consistent with lease provisions cannot be taken as a surrender of the lease which authorizes that very conduct. When a landlord relets in accordance with rights reserved in the lease, there is no acceptance of a surrender in the absence of expression of a clear intention to release the tenant. See *Yates* v. *Reid*, 36 Cal.2d 383, 385 (1950); *Provident Mut. Life Ins. Co.* v. *Tachtronic Instruments, Inc.*, 394 N.W.2d 161, 164 (Minn. Ct. App. 1986); *Windsor Real Estate & Mort. Co.* v. *Ruma*, 710 S.W.2d 316, 318 (Mo. Ct. App. 1986); 2 Powell, Law of Real Property 249[1] (1990).

It follows that during the three months before the new lease with the successor tenant began, the landlord was entitled to rent ($3,000 per month) and additional rent for increased taxes and operating expenses.[3]

---

[3]The last month for which the tenants paid rent was December, 1988. They did not pay any of their tax and operating expense payments. The

2. *Other damages.* Rent for the basement level space in the new lease, which had only a two-year initial term, was set at $1,625 per month. Were the new tenant to exercise an extension option the rent was to increase to $2,000 per month beginning with the third year, and, were the new tenant to exercise further extension options, would reach the level of rent of the abandoned lease only in the ninth year of occupancy by the new tenant. During the first thirteen months of the new lease, rent would be waived. The trial judge found that the low rent, the waiver of a portion of that already lowered rent, and the grant to the new tenant of one month's free rent (worth $6,250) on the first floor space were inducements to the new tenant "to keep her as a viable tenant on the first floor," and to have her invest some $125,000 in building improvements, including bathrooms and access for handicapped persons on the basement level.

Evidence was received through Atkinson and through an expert witness called by the landlord, that these were commercially reasonable arrangements, taking into account the depressed state of the rental market in Boston in 1989. No contrary evidence was offered by the tenants. From that evidence the judge made irreconcilable findings, which the Appellate Division accepted on the ground that findings of fact are to be accepted unless clearly erroneous. See Mass.R.Civ.P. 52 (a), 365 Mass. 816 (1974). Deference to a

---

new lease made by the landlord began April 1, 1989. For the three months, therefore, the calculation of damages is as follows:

| | |
|---|---|
| Rent: 3 months x $3,000 | $ 9,000.00 |
| Operating Expenses (1988): | 2,192.58 |
| Operating Expenses (3/12 of 1989): 3/12 x $1,890.85 | 472.71 |
| Taxes (9/12 Fiscal Year 1989): 9/12 x $4,967 | 3,725.25 |
| Clean-up costs: | 356.50 |
| Broker's commission attributable to defendants' lease term | 487.50 |
| Less: Security deposit | (3,000.00) |
| Total Damages: | $13,234.54 |

To this should be added the landlord's reasonable legal fees and costs involved with pursuing the landlord's rights against the tenants, including those generated by this appeal. Section 19 of the lease between the landlord and the tenants provides for the reimbursement to the landlord of such expenses, plus interest at the rate of twelve percent per annum.

trial judge's findings reaches its limit, however, when they are mutually antagonistic or without basis in the record. See *Springgate* v. *School Comm. of Mattapoisett*, 11 Mass. App. Ct. 304, 309-310 (1981).

Here the judge found on one hand that the landlord failed to take steps to mitigate damages and, therefore, was entitled to none; on the other hand, the judge found that the new lease was part of such an excellent deal for the landlord that the landlord suffered no damages. The foundation for the latter ultimate finding was the judge's subsidiary finding "that the improvements to the real estate far exceed any damages alleged to be suffered by plaintiff." If the "failure to mitigate"[4] finding were correct then it could not also be said that the landlord had made a new deal which more than made him whole. If the latter were the case, the conclusion is compelled that the landlord had successfully mitigated damages to zero.

On the basis of the record and the findings made by the judge in light of the landlord's evidence, no finding about the commercial unreasonableness of the reletting is sustainable. The judge expressly declined to credit the testimony of the landlord and the landlord's expert on this subject. A trial judge is entitled so to do, but disbelieving evidence does not establish the contrary proposition, *Kunkel* v. *Alger*, 10 Mass. App. Ct. 76, 86 (1980), and the burden of proving that the landlord had not made a commercially reasonable lease, i.e., had not been diligent in obtaining a reasonably fair rent, fell

---

[4]At common law there was no duty by a landlord to mitigate damages if a tenant vacated the leased premises. *Fifty Assocs.* v. *Berger Dry Goods Co.*, 275 Mass. 509, 514 (1931). A lease, after all, was the grant of an estate in land, and the landlord owed the tenant only quiet enjoyment. The tenant was the owner of the leased premises for a term and. if the tenant chose to abandon the premises, that was no concern of the landlord. *United States Nat'l. Bank* v. *Homeland, Inc.*, 291 Or. 374, 378 (1981). The landlord did not have obligations to the tenant that were in the nature of contractual obligations. See *Boston Hous. Authy.* v. *Hemingway*, 363 Mass. 184, 188-189 (1973). If, however, the landlord reenters the leased premises for the purpose of reletting, as provided in a written lease, the landlord owes the tenant a duty of reasonable diligence in obtaining fair rent. See *Woodbury* v. *Sparrell Print*, 198 Mass. 1, 9-10 (1908).

on the tenants, *Bingham* v. *Colson*, 325 Mass. 761 (1950); *American Mechanical Corp.* v. *Union Mach. Co.*, 21 Mass. App. Ct. 97, 103 (1985). They, on the basis of what may be read from the draft report, offered no evidence. Any basis for a finding that the rent in the new lease was not reasonably fair is missing.

The same difficulty applies to the finding that the rent not paid by the tenants in the twenty-two months left in their lease term ($66,000, without regard to the tax and operating expense components) was more than compensated for by the improvements made by the replacement tenant and by the over-all economic benefits of the new lease. That conclusion seems to have been arrived at intuitively. Again, the only evidence was that the improvements would likely not be useful to a successor tenant. The judge disbelieved that evidence. As we observed before, he was entitled so to do. Lacking, however, is any evidence of what might be a proper amortization period for the leasehold improvements and in what amount that might be regarded as benefit derived by the landlord. Similarly lacking in the record is evidence about how long the first-floor space had been vacant and whether the ability of the landlord to lease the first-floor space was enhanced by the fortuitous availability of the basement space, an enhancement which could be set off against rent the tenants owed. As to additional rent for taxes and operating expenses, if the new tenants, beginning April 1, 1989, were, as appears to be the case, making payments on account of taxes and operating expenses, those payments would cancel out obligations on that score by the old tenants. The trial judge needs to reexamine the question of post-April 1, 1989, damages.

3. *Chapter 93A damages.* The courts below concluded that the plaintiff had suffered no damages; neither, therefore, had occasion to consider the landlord's claim for damages under G. L. c. 93A. As we have concluded that damages are due, the question becomes pertinent.

In *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 474 (1991), the court said that "conduct 'in disregard of

known contractual arrangements' and intended to secure benefits for the breaching party constitutes an unfair act or practice for c. 93A purposes. *Wang Labs, Inc.* v. *Business Incentives, Inc.*, 398 Mass. 854, 857 (1986)." At first blush, that language fits the case at hand. The tenants found another location for their business that was more convenient, larger, and cheaper. To reap those benefits, they chose cheerfully to disregard their obligations under their lease with the landlord. Their leave taking was peremptory and accompanied by sham justifications about "no alternative but to seek new facilities" at a time when they had already signed up for their new location.

Examination of the facts in the *Pier Four* case and the cases there cited[5] discloses an additional factor. There is in those decisions a consistent pattern of the use of a breach of contract as a lever to obtain advantage for the party committing the breach in relation to the other party; i.e., the breach of contract has an extortionate quality that gives it the rancid flavor of unfairness. Cf. *Piccicuto* v. *Dwyer*, 32 Mass. App. Ct. 137, 139 (1992). In the absence of conduct having that quality, a failure to perform obligations under a written lease, even though deliberate and for reasons of self-interest, does not present an occasion for invocation of c. 93A remedies. Conventional damages achieve the goal of compensation, particularly because written leases often, as here, provide that the landlord may recover the legal expenses of pursuit, plus interest at the rate of twelve percent.

The order of the Appellate Division of the Boston Municipal Court dismissing the report is reversed and the judgment is vacated. The case is remanded to the Boston Municipal Court for the entry of a new judgment, at least in accordance with the computations in note 3 of this opinion and for further proceedings consistent with this opinion, including the

[5]*Hannon* v. *Original Gunite Aquatech Pools, Inc.*, 385 Mass. 813, 825 (1982). *Datacomm Interface, Inc.* v. *Computerworld, Inc.*, 396 Mass. 760, 779 (1986). *Wang Labs., Inc.* v. *Business Incentives, Inc.*, 398 Mass. 854, 857 (1986). *Pepsi-Cola Metropolitan Bottling Co.* v. *Checkers, Inc.*, 754 F.2d 10, 17-19 (1st Cir. 1985).

taking of additional evidence, concerning damages, if any, between April 1, 1989, and October 31, 1990,[6] and the reasonable legal costs incurred by the landlord.

*So ordered.*

---

[6]Concerning the post-April 1, 1989, damages, the parties may wish to consider if, in the interest of husbanding their resources, the question might best be submitted to arbitration by a person who is active in the Boston real estate market.