Botsford, J.
Introduction
consolidated actions concem disputes be-^£611 a landlord ^ its commercial tenant. The first (Nq 94_2268.c)i brought by Walter S. Burrage, Jr., alleges breach of the rental contract and violation of G.L.c. 93A against Samuel E. Mintz and entities associated with him, one of which, Mintz Associates Architects/Planners, Inc., was Burrage’s landlord.[1] The defendants in that action have counterclaimed for unpaid rent and violation of G.L.c. 93A. The second action (No. 94-5059-B) is one for summary process, *239 brought by Mintz Associates Architects/Planners, Inc.[2] against Burrage. At the time the summary process action was filed, Burrage remained a tenant of Mintz Associates, but by the time of trial, he was not, leaving only the issue of unpaid rent open in the summary process case.
The cases were tried together before me in December 1994, without a jury. Set forth below are findings of fact and a discussion of the legal issues raised.
Findings of Fact
Mintz Associates is a Massachusetts corporation with a principal place of business at One Dock Square, Boston, Massachusetts (the premises). Mintz is an architect and the principal of Mintz Associates; at all relevant times, his professional offices were in the premises.
Beginning in 1973, Burrage rented a portion of the penthouse in the premises as his office for his investment advisor business, which was originally called The Manchester Fund and at some time before 1991, called The Manchester Fund II.[3]
The owner of the premises is 16-18 North Street Trust. Mintz and his wife are the trustees of this trust.
At all relevant times, Mintz Associates[4] rented the fifth and sixth floors of the premises from North Street. Beginning in 1973, Mintz Associates sublet a portion of the sixth floor — the penthouse of the premises — to Burrage. Beginning approximately January 1, 1976, Mintz Associates began to sublet the entire sixth floor to Burrage.
In July 1973, Burrage and Mintz Associates entered into their first written lease agreement. This provided, inter alia, that it could be cancelled by either party by giving 90 days’ notice. The monthly rent stipulated in the agreement was $667, which was to cover rent, utilities and cleaning for the rented portion of the penthouse. The parties executed a second lease agreement on July 1, 1976 for the entire sixth floor. The monthly rent was $ 1500, and Burrage was also to pay 37.5% of increases in operating costs and real estate taxes which the owner, the North Street Trust, charged to Mintz Associates. In June 1985, Mintz Associates sent a letter to Burrage which indicated the new rent for the premises was to be $2940 per month. The letter also provided that the lease arrangement would continue to include the same agreement for the payment by Burrage of a percentage share of operating expense and real estate tax increases. Finally, the letter requested Burrage to sign it if he agreed with the terms. Burrage did not sign this letter. He did, however, begin to pay rent at the level of $2940 per month, but did not pay any monies for operating expense and tax escalation expenses.[5]
Mintz Associates and Burrage entered into a fourth lease agreement on June 25, 1992; the 1992 agreement forms the basis of the parties’ respective breach of contract and summary process claims in this case.[6] In this agreement, Burrage agreed to pay back rent for the period of December 1991 through June 1992 at the rate of $2940 per month for December 1991 and January 1992, and at the rate of $2000 for the remaining months.[7] The rent was to be paid on the first of the month, and if not paid, there would be a 1V6% monthly charge for late payment.[8] In addition, the parties agreed that rent for the future would be $2000 per month, and that there would be no obligation on the part of Burrage to pay operating expense or tax escalation charges. They further agreed that Burrage might have an additional subtenant to the one he had at the time. Finally, it was agreed that Mintz Associates would use its “best efforts to maintain a comfortable temperature (65 to 75) year round on the sixth floor. Some especially hot days may require the thermostat to be lowered and some especially cold days may require the thermostat to be raised.” (Trial exhibit 9.) Under this letter rental agreement, and at all times, Burrage was a tenant at will of Mintz'Associates.
From July 1992 through July 1993, Burrage paid monthly rent to Mintz Associates in the amount of $2000, although the payments for almost all of these months was not on the first of the month. Beginning in August 1993, Burrage again withheld rent, and continued to do so through October 1993.
From 1982 to November 1993, Mintz was a shareholder, along with Burrage, in a corporation engaged in developing a condominium real estate project in Gloucester, Massachusetts. The corporation was named Rockaway Rocky Neck Corporation (“Rocka-way”). Burrage held 50% of the outstanding shares in Rockaway, and Mintz held 30%. Under the arrangement between Burrage and Mintz, Burrage was to serve as president of the corporation and to manage the project, and Mintz Associates was to provide necessary architectural services. Beginning in approximately 1992, Burrage and Mintz were involved in continuing disputes about the Rockaway development project. Burrage, in his capacity as president of Rock-away, issued several “calls” for cash contributions to be made by the shareholders of the corporation to pay outstanding bills and obligations. In November 1992, Mintz wrote Burrage a letter and indicated he would make no further contributions, raising the issue of when Mintz Associates was to be paid for architectural services on the project that remained unpaid, and questioning the competence of Burrage’s management of the project. Burrage thereafter filed suit against Mintz, seeking to obtain the requested cash contributions.[9] In May 1993, Mintz began an arbitration proceeding against Rockaway and Burrage, presumably pursuant to the architectural services contract that Mintz Associates had entered into with Rockaway.
By an agreement dated November 1, 1993, Mintz, Mintz Associates, Burrage and Rockaway settled both Rockaway’s lawsuit against Mintz and the arbitration proceeding initiated by Mintz against Burrage and *240 Rockaway. (Trial exhibit 16.) Under the agreement, among other provisions, Burrage agreed to pay Mintz Associates $6000 as rent for the premises for the months of August through October 1993; Mintz transferred all his shares of stock in Rockaway to Burrage; and Mintz was relieved of all obligations he had on various notes to financial institutions on behalf of Rockaway. The agreement further provided that
[a]ll prior agreements between Mintz and/or Mintz Associates, on the one hand, and Burrage and/or Rockaway, on the other hand, except for the letter agreement dated June 24, 1992 between Burrage d/b/a The Manchester Fund and Mintz Associates regarding the rental of space at One Dock Square, Boston, are hereby terminated and shall have no further force or effect. . .
(Trial Exhibit 16, p. 5, ¶8.) Finally, this agreement included releases by Burrage of all claims against Mintz and Mintz Associates, and corresponding releases by Mintz and Mintz Associates of all claims against Bunrage:
11. Releases. Burrage individually and d/b/a The Manchester Fund and Rockaway do hereby remise, release and forever discharge Mintz and Mintz Associates and their respective directors, [and] officers ... from any and all demands, actions, causes of action, suits, claims or damages, known or unknown, arising from the beginning of the world to the date of this Agreement, including without limitation those claims asserted in the Lawsuit and in the Arbitration Proceeding. Mintz and Mintz associates do hereby remise, release and forever discharge Burrage individually and d/b/a The Manchester Fund and Rockaway . . . from any and all demands, actions, causes of action, suits, claims, or damages, known or unknown, arising from the beginning of the world to the date of this Agreement, including without limitation those claims asserted in the Lawsuit and Arbitration Proceeding.
(Id., p. 6, ¶11.)[10]
Beginning in November 1993, Burrage once more declined or refused to pay rent for the penthouse in the premises. He did not pay rent through November of 1994, when the trial of these actions began. In November 1994, rent for that month was paid in escrow.
During the winter of 1993-1994 — the months of November and December 1993 and January through February 16, 1994, in particular — one of the two heating systems that was used to provide heat to the fifth and sixth floors of the premises was broken: the baseboard heating system was functioning, but the supplementary system needed a new part that was not readily available. Mintz requested the company that maintained the system to fix it, but it was unable to because it did not have the proper part. Mintz apparently took no further steps to effect a repair to the system for some months, nor did he undertake to replace the supplementary system. As a consequence, the temperature in the penthouse during these months was often extremely cold: on many weekdays the temperature was between 50 and 60 in November, between 40 and 50 in December, between 40 and 60 in January, and between 40 and 55 in the first half of February. Burrage and his assistant, Marie Ferguson, complained about the lack of heat often. Mintz explained that there was a problem with the heat, and suggested that they obtain and use more space heaters. Burrage and Ferguson did so, sometimes using as many as five or six space heaters, but were still cold. (Burrage was responsible for purchasing the space heaters; Mintz Associates was responsible for the electricity charges incurred as a result of their use.) The cold temperatures meant that Burrage and Ferguson needed to keep their coats on inside on many days, and substantially interfered with their ability to work.
In February 1994, Mintz finally had the supplementary heating system fixed, and it then began to work. After mid-February, 1994, neither Burrage nor his assistant Ferguson complained in writing about any lack of heat, and it does not appear that either continued the practice after that time of recording the daily temperatures in their offices.
I find that while it undertook some efforts to maintain the heat between 65 and 75 degrees from November 1993 to February 1994, Mintz did not use its best efforts to do so: the broken heating system represented a crisis that required a far more aggressive response than waiting for over three months for a missing part and suggesting to Burrage that he purchase and use space heaters. I also I find that on and after February 16, 1994, for the remainder of that winter, the heat was adequate on the sixth floor.[11]
In late February 1994, Mintz notified Burrage in a letter that he was requesting Burrage to quit the premises at the end of March 1994. Burrage did not respond in writing, and did not leave, although he began, slowly, to look for other space. He continued not to pay the rent. On April 27, 1994, Mintz sent Burrage a letter which included a notice to quit the premises within fourteen days.[12] On April 28, 1994, Burrage filed the contract action at issue here, alleging that Mintz had willfully refused to maintain the temperatures in accordance with the June 24, 1992 letter agreement, which action constituted a breach of contract, constructive eviction and a violation of G.L.c. 93A.
Burrage remained on the sixth floor of the premises throughout the summer and most of the fall of 1994. He apparently entered into an agreement to rent space at 79 Milk Street in Boston in June or July 1994, but did not sign a lease for the new space until October 31, 1994. In August 1994, Mintz Associates sent Burrage another notice to quit which Burrage received *241 on or about August 15, 1994. In September 1994, Mintz Associates filed the summary process action at issue here in the Superior Court.
Burrage finally moved out of the premises on or about November 15, 1994. Burrage is paying $800 per month for the Milk Street space, and apparently he has rented more space than he had in the premises.
During the summer of 1994, the air conditioning system in the premises was not cooling the sixth floor to a temperature of 75 degrees or less on a good number of days. In the second half of May, and in June, July and August, the temperature was over 80 degrees or over 90 degrees on some days each month. Burrage and Ferguson made some oral complaints about the temperature, but Mintz did not undertake any action to improve the air conditioning. While the heat was uncomfortable, it did not make the space completely unusable; work could go on.[13] I find that during the late spring and summer of 1994, Mintz Associates did not use its best efforts to maintain the temperature between 65 and 75 degrees.
In October 1994 and the first half of November 1994, there was no heat or hot water on the sixth floor of the premises. I find that during this time, Mintz Associates did not use its best efforts to provide that the temperature would remain between 65 degrees and 75 degrees in the penthouse.[14]
As indicated above, Burrage frequently if not always had at least one subtenant on the sixth floor of the premises during the time he rented there.[15] As of June 1992, when the parties entered the letter agreement, Burrage had one subtenant, a Nicholas Kelly, who had rented space for a long time. He paid Burrage $1000 per month. Kelly left on November 30, 1993, because he had an opportunity to join or rent space in a law firm. He did not leave because of inadequate heat or air conditioning.
In late June 1992, Daniel Gerrity began to rent space in the penthouse from Burrage, paying him $1000 per month. In July 1993, he left the space because of the inadequate heat in the winter and the inadequate air conditioning in the summer.[16]
After careful consideration of the testimony and other evidence presented at trial, including Burrage’s testimony on value, I find that the fair rental value of the sixth floor of the premises in November and December of 1993, January 1994, and the first half of February 1994, was $700 per month.
The fair rental value of the sixth floor of the premises for the second half of February 1994 through the first half of May 1994 was the full $2000 per month.
The fair rental value of the sixth floor of the premises in the second half of May 1994 and June through August 1994 was $1000 per month.
The fair rental value of the sixth floor of the premises in September 1994 was the full $2000 per month.
The fair rental value of the space in October 1994 through November 15, 1994 was $700 per month.
Conclusions of Law
As a threshold matter, I note again that the settlement agreement dated November 1, 1993 settled all claims between the parties “arising from the beginning of the world to [November 1, 1993].” That agreement specifically references the lease arrangement described in the parties’ June 24, 1992 letter, and settled all disputes between the parties relative to the leased premises as of November 1, 1993, while keeping the terms of the 1992 lease agreement alive. Therefore, I need only consider the claims of the parties that arose after November 1, 1993.
The Summary Process Claim, Claim for Unpaid Rent, and Claim for Breach of the Rental Contract
As stated earlier, Burrage is no longer in the premises, so the possessory aspect of the summary process case is moot. Because an analysis of Mintz and Mintz Associates’ counterclaim for unpaid rent in the first case will necessarily decide any issues remaining in the summary process claim, I see no reason to address the summary process claim separately. The summary process claim will be dismissed.
Mintz Associates urges the court to apply the independent covenant rule to the present facts. That rule provides that, in a commercial lease, the tenant’s obligation to pay the specified rent is an independent covenant and the tenant has no right to withhold rent because of a breach by the landlord. See, In re J.A.G., Inc., 7 B.R. 624, 627 (D. Mass. 1980); Barry v. Frankini, 287 Mass. 196, 201 (1934). Mintz Associates argues that no breach of covenant by the landlord in a commercial lease, except real or constructive eviction, excuses the tenant from paying rent. Id.
Burrage claims that he was constructively evicted, and he seeks damages for Mintz and Mintz Associate’s breach of the rental contract.
Although the independent covenant rule has traditionally been applied in the commercial lease context, the present vitality of the rule in Massachusetts is questionable at best. See Holmes Realty Trust v. Granite City Storage Co., 25 Mass.App.Ct. 272, 277 and n.2 (1988); Reed v. United States Postal Service, 660 F.Supp. 178 (D. Mass. 1987); See also Boston Housing Authority v. Hemingway, 363 Mass. 184 (1973). In Hemingway, the Supreme Judicial Court held that the underlying rationale for the independent covenant rule was outdated and the court abandoned the rule as applied to residential leases. Id. at 197-98. The court ruled that where a landlord’s failure to repair amounted to a breach of the warranty of habitabiliiy, a residential tenant may withhold rent. Id. at 198.
In Reed v. United States Postal Service, 660 F.Supp. 178 (D. Mass. 1987), the court, applying Massachusetts law, disapproved of the use of the independent *242 covenant rule in the In re J.A.G., Inc. decision (cited above) and held that “the rationale behind the decision in Hemingway applies with equal force to commercial leases.” Id. at 182. Subsequently, in Holmes Realty Trust v. Granite City Storage Co., 25 Mass.App.Ct. 272 (1988), the Massachusetts Appeals Court recognized that “there is great doubt whether the [independent covenants] formulation remains a correct statement of Massachusetts law,” and suggested that Massachusetts courts may ultimately follow the modem trend of viewing covenants in commercial leases as mutually dependent. Id. at 277 and n.2 (1988). See also, Restatement (Second) of Property, Landlord & Tenant §7.1(2) and comment c (1977); Teodori v. Werner, 490 Pa. 58, 415 A.2d 31, 33-35 (1980) (relying on the Restatement).
I am persuaded by the Reed and Holmes Realty decisions as well as the Restatement. I decline to apply the independent covenant rule to this commercial lease. Mintz Associates’ breached a covenant to provide certain essential services, and that covenant was an inducement to Burrage to enter into the lease agreement. In light of the often deplorable lack of heat and air conditioning in the premises in late 1993 and 1994, Burrage was entitled each month to set off the difference between the specified rent and the fair rental value of the premises as they in fact existed.
Because I find that the covenant to pay the specified rent does not exist in isolation under the circumstances, but was dependent on the landlord’s covenant to supply certain services, I need not decide whether Burrage has met his burden of establishing his defense of constructive eviction.[17]
While it is clear that Mintz and Mintz Associates are entitled to prevail on their claim for unpaid rent, that claim is to be reduced by the damages sustained by Burrage for the breach of the covenant in the rental agreement to supply adequate heat and air conditioning. [18] Where a landlord breaches a covenant in a rental agreement for the provision of certain essential services, or breaches the covenant of quiet enjoyment, and the tenant remains in possession of the premises, the appropriate measure of damages is the difference between the value of what the tenant should have received and the fair value of what he in fact received. Charles E. Burt v. Seven Grand Corp., 340 Mass. 124, 130 (1959). The amount of rent agreed upon between the parties may reflect the fair value of what the tenant should have received if the landlord had performed its obligations fully. Id. at 130-31. Where the landlord has breached a covenant to provide heat, the “measure of damages is the difference in value of the premises, heated . . . and the value of said premises as they were in fact heated . . .” A&SProducts Corp. v. Parker, 334Mass. 189,192 (1956).
As the findings indicate, the fair rental value of the sixth floor of the premises from November 1993 through November 1994 was not always the $2,000 per month in fixed rent, but was for the most part significantly lower due to Mintz Associates’ breach of its obligation to provide adequate heat and air conditioning. After thorough consideration of the evidence, I conclude that Burrage owes Mintz Associates $15,000 for the fair value of his use and occupation of the premises from November, 1993 through November, 1994. In addition, according to the June 19, 1992 letter which was incorporated into the lease agreement, late rent payments are subject to a late fee of one and a half percent per month. At that rate, Bunrage owes interest through the date of the issuance of this decision of $3,436.00. The rent and interest figures are calculated as follows:
MONTH Nov. 1993 Dec. 1993 Jan. 1994 Feb. 1994 Mar. 1994 Apr. 1994 May 1994 Jun. 1994 Jul. 1994 Aug. 1994 Sep. 1994 Oct. 1994 Nov. 1994 TOTALS FAIR RENT VALUE $700.00 $700.00 $700.00 $1,700.00 $2,000.00 $2,000.00 $1500.00 $1,000.00 $1,000.00 $1,000.00 $2,000.00 $700.00 $700.00 $15,000.00 MONTHS LATE 21 20 19 18 17 16 15 14 13 12 11 10 (escrow) xl.5% = INTEREST $220.00 $210.00 $199.50 $459.00 $510.00 $480.00 $337.50 $210.00 $195.00 $180.00 $330.00 $105.00 $3,436.00
Of the money that Burrage paid into escrow in November of 1994, $700.00 plus the interest accrued thereon in the escrow account, shall be applied to the $18,436.00 that Burrage owes Mintz and the entities associated with him.
Chapter 93A Damages
Both parties claim that they are entitled to recover under G.L.c. 93A, and indeed to recover multiple damages from each other. “Conduct ‘in disregard of known contractual arrangements’ and intended to secure benefits for the breaching party constitutes an unfair act or practice for c. 93A purposes.” Anthony’s Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 474 (1991), citing Wang Labs, Inc. v. Business Incentives, Inc., 398 Mass. 854, 857 (1986). In the context of a breach of contract, however, chapter 93A damages are not available unless “the breach . . . has an extortionate quality that gives it the rancid flavor of unfairness.” Atkinson v. Rosenthal, 33 Mass.App.Ct. 219, 226 (1992). “In the absence of conduct having that quality, a failure to perform obligations under a written lease, even though deliberate and for reasons of self-interest, does not present an occasion for invocation of c. 93A remedies.” Id.
In support of his chapter 93A claim, Burrage alleges that Mintz Associates failed to maintain the temperature in accordance with the rental agreement “in order to recover possession of the [pjremises without following judicial process.” While the evidence presented at trial established that Mintz Associates’ conduct relative to the temperature violated the rental agreement, in the context of the relationship between these parties — where animosity towards the other was growing *243 on both sides, not without some reason — I do not find that the breach by Mintz Associates crossed the line from a contract violation into something more coercive or unfair. In fact, Mintz Associates was seeking to use the proper judicial process to terminate Burrage’s tenancy throughout 1994. Imposition of c. 93A damages is not appropriate. See id.
Mintz and Mintz Associates claim that Burrage engaged in unfair practices under c. 93A by withholding rent: (1) “simply because he hoped he could get away with it”; (2) in order to force Mintz Associates to make concessions regarding contractual obligations under the lease agreement; and (3) in order to force Mintz to make concessions regarding alleged obligations concerning Rockaway. The second claim, which focuses on Mintz’ allegations of duress in relation to the June 1992 rental agreement, as well as the third claim appear to be moot because of the releases contained in the 1993 settlement agreement.[19]
Otherwise, Burrage’s conduct does not amount to a violation of c. 93A. Again, I refer to the mutually escalating levels of retaliatory conduct on both sides of this landlord-tenant relationship. Furthermore, I concluded above that Burrage was entitled, in effect, to withhold rent in response to Mintz Associate’s breach of its covenant to provide certain services under the lease. Although Burrage withheld all rental payments during the period, and did not place the rent in escrow except for a single payment in November of 1994, in the circumstances, I conclude that Burrage’s conduct constituted a breach of contract, but no more. See Atkinson v. Rosenthal supra, 33 Mass.App.Ct. at 226.
ORDER
For the foregoing reasons, it is ORDERED that:
1. In No. 94-2268-C, a final judgment is to enter as follows:
On Count I of the amended complaint, judgment is to enter in favor of the plaintiff; on Count II of the amended complaint, in favor of the defendants, and dismissing the count as duplicative of Count I; on Count III of the amended complaint, in favor of the defendants, and dismissing the count, on Count I of the counterclaim, in favor of the plaintiff-in-counterclaim, Mintz Associates Architects/Planners, Inc., in the amount of eighteen thousand three hundred forty-six dollars and no cents ($18,346.00) (which sum includes prejudgment interest), plus costs; on Count II of the counterclaim, in favor of the defendant-in-counterclaim, and dismissing Count II; on Count III of the counterclaim, in favor of the defendant-in-counterclaim, and dismissing Count III; on Count IV of the counterclaim, in favor of the defendant-in-counterclaim and dismissing Count IV as duplicative of Count I of the counterclaim; on Count V of the counterclaim, in favor of the defendant-in-counterclaim, and dismissing CountV.
2. In No. 94-5049-B, a final judgment is to enter dismissing the action as moot.

In late April of 1995, Burrage filed a motion to amend the complaint in civil action number 94-2268-C to include a count for “deceit/misrepresentation” and an additional count for “violation of G.L.c. 93A Sec. 2, 11.” Mintz Associates filed a memorandum in opposition to the proposed amendment. Because the proposed amendment was filed four months after trial, I find that to allow the amendment after such undue delay would substantially prejudice the defendant. Accordingly, Burrage’s motion to amend the complaint is denied.

For ease of reference, Samuel E. Mintz will be referred to in this memorandum of decision as “Mintz,” and Mintz Associates Architects/Planners, Inc. will be referred to as “Mintz Associates.”

At times, particularly in the earlier years of Burrage’s tenancy, it appears that the actual rental agreements were between Mintz Associates and The Manchester Fund rather than Burrage himself. However, there does not appear to be any evidence that the Manchester Fund or the Manchester Fund II was an organized entity legally separate from Burrage. Furthermore, the lease agreement that is at issue in this case, dated June 1992, was executed by Burrage individually. In the circumstances, I generally refer to Burrage as the tenant of Mintz Associates.

In 1973, Mintz’ architectural firm was named PARD Team, Inc., but at some point changed its name to Mintz Associates. Only Mintz Associates is referred to in this memorandum of decision.

Although, for reasons discussed below, findings concerning the agreements, rights and corresponding obligations of the parties before November 1993 is not relevant, I have accepted the testimony of Burrage that in 1985 he agreed to the increase in rent, but not to the continuation of the operating expense and tax escalation clauses of previous leases.

The execution of the June 24, 1992 agreement was preceded by Burrage’s declining or refusing to pay rent for any of the months from December 1991, through June 1992. The parties dispute vigorously the intent and purpose of this rent withholding on the part of Burrage. Based on his trial testimony, Mintz claims that Burrage refused to pay rent because he knew Mintz and Mintz Associates were in straitened financial circumstances — due in substantial part to the unanticipated loss of the Commonwealth as a tenant on three floors of the premises in 1990 — and that Burrage was attempting unfairly to exert pressure on Mintz Associates to lower the monthly rent from $2940 to $2000. Mintz further contends that he signed the June 1992 agreement under duress to ensure that Burrage would not make good on his threat to leave the premises if no rent concessions were forthcoming. Burrage, on the other hand, testified at trial, and now asserts, that as early as the beginning of 1991, Mintz had promised him that he would lower the rent, but had asked Burrage to wait because of the difficulty caused by the Commonwealth’s departure as a major tenant; that he did wait through 1991, repeatedly trying to speak with Mintz about the problem but getting repeatedly rebuffed; and that he began to withhold his rent as the only way he could make Mintz focus on the problem. I do not need to resolve the conflicting interpretations of what happened, since, as discussed below, I conclude that both parties have waived any claims with an origin before November 1993.1 add, however, that I am not persuaded on the facts by Mintz’ claim of duress in negotiating the 1992 rental agreement.

The agreement indicates that Burrage paid Mintz Associates a check for $15,880 at the time of signing, which represented “full and final payment for any and all obligations through the end of.. . June 1992,” and an additional $2000 *244 for July rent. There seems to be no dispute these funds were paid.

The provision for a late charge is not spelled out in the June 24, 1992 letter which both parties signed, but it is set out in a letter sent by Mintz to Burrage dated June 19, 1992. (Trial exhibit 8.) The June 24 letter states at the outset that “this letter [i.e., the June 24 letter], your letter responding to my June 1 letter [i.e., the June 19 letter], and my June 1 letter constitute agreement on all matters related to the past and the future rental of the Penthouse, at One Dock Square.” Given the incorporation of the June 19, 1992 letter into the parties’ agreement, I find that the parties did contemplate there would be a monthly late charge for rent paid later than the first of the month.

Rockaway Rocky Neck Corporation v. Samuel B. Mintz. et al., C.A. No. 927484 (Suffolk Superior Court).

The agreement also includes a provision that it represents the entire agreement between the parties, that “[n]o other statement or prior written material extrinsic to this Agreement shall have any force or effect . . . [and that] [n]o party is relying on any representation other than those expressly set forth in this Agreement.” (Trial exhibit 16, p. 7, ¶13.)

A substantial amount of testimony was introduced by Burrage concerning the alleged lack of heating in the 1992-1993 winter; he claims that up to 1992, the heat in the penthouse was sometimes faltering but generally adequate, but that in 1992, Mintz began to retaliate against Burrage for his nonpayment of rent by reducing the available heat to almost nothing on many occasions. Given the parties’ release of each other concerning all claims before November 1993, this evidence is not directly relevant to Burrage’s breach of contract claim at issue in this action. Perhaps it might be relevant on the issue of an alleged pattern of behavior on the part of Mintz towards Burrage that continued into the winter of 1993-1994. However, as the findings above indicate, I conclude on the evidence concerning 1993-1994 itself that heat was inadequate from November 1993 through the first half of February 1994, and adequate for the remaining winter months of 1994.

It appears that Mintz thereafter filed an action for summary process in the Boston Municipal Court which was dismissed because Mintz had not complied with all the requirements of a summary process action.

Burrage and Ferguson both testified that the premises were at times unbearably hot, and on a few occasions, they could not work there. Jeffrey Lambert, an attorney who did business with Burrage and visited Burrage’s office at least two times per month in 1993 and 1994, testified that the heat was uncomfortable, but he and Burrage could do business.

Mintz testified that the absence of heat and hot water was the result of the inability of North Street, the owner of the building, to pay its gas bill because of the absence of any rental payments from Burrage, and that it was not until mid-November that Mintz was able to negotiate a payment arrangement with the gas company. I do not credit this testimony; the timing of the renewed heat and hot water — apparently right after Burrage left — is too coincidental, and there were no exhibits introduced to support the claim that Boston Gas shut off heat and hot water because of nonpayment, or that Mintz only was able to negotiate a payment schedule in mid-November.

One of Burrage’s “subtenants,” in effect, was Rockaway. From 1983 to approximately September 1991, Burrage received $1000 per month in rent from Rockaway, as payment for the expense of running the real estate development project out of his offices. There was a great deal of emphasis put by Mintz on the alleged fact that he was not made aware until the parties’ arbitration proceedings in 1993 that this rent was charged by Burrage to Rockaway, and thus that Mintz, as one of the Rockaway shareholders, was paying a portion of the rent. Burrage testified that Mintz knew for a long time before 1993 about the rental expense charge. I do not need to resolve whether Mintz did or did not know of the charge because all the rental payments in question were paid to Burrage before 1993, and thus the release given by Mintz to Burrage in November 1993 would appear to close out any claim based on Burrage’s alleged withholding of information.

As the last sentence in the text makes clear, Gerrity left before November 1993, and thus Burrage can make no claim related to his departure against Mintz or Mintz Associates.

Ordinarily, a tenant can only make out a defense of constructive eviction if the tenant quits the premises within a reasonable time after the alleged wrongful conduct of the landlord. Palumbo v. Olympia Theaters, 276 Mass. 84, 88 (1931). Notwithstanding my rejection of the rule stated in In re J.A.G., Inc., 7 B.R. 624, 627 (D.Mass. 1980), requiring that a commercial tenant be constructively evicted in order to avoid full rent payments, it is worth noting that a commercial tenant need not always quit the premises within a reasonable time to invoke successfully a constructive eviction defense. See Charles B. Burt v. Seven Grand Corp., 340 Mass. 124, 130 (1959). In the present case, Burrage held over as a tenant for about one year without paying rent. In the circumstances this period was more than a reasonable time. Nevertheless, it is fair to say that, had Burrage abandoned the premises substantially earlier, he probably would have satisfied the requirements for a constructive eviction. Following Burt, a tenant that would have been constructively evicted had he departed within a reasonable time, but who stays on in the premises, only owes fair value and not the full specified rent for the use and occupation of the premises during the period after the putative constructive eviction. Burt, at 131. Thus, even if I followed the old independent covenant rule stated in In re J.A.G., Inc., following Burt, the end result in this case would be the same.

Burrage also claims that he is entitled to damages for his moving expenses and for lost rental income from sub-lettors. The claim for moving expenses is without merit. When he left the premises, Burrage had been served with two notices to quit, and in any event, Burrage at all relevant times was a tenant at will. Under the terms of his lease arrangement and in the factual circumstances of this case, moving costs are not a consequential damage Burrage is entitled to claim.
Burrage’s claim for lost rental income is likewise without merit. In certain cases where it was found that commercial landlords breached their obligation to provide essential services, courts have allowed the tenant to recover for a loss of business income. See, e.g., Winchester v. O’Brien, 266 Mass. 33, 38 (1929). In the present case, however, Burrage does not claim that he was in the business of subletting property. It appears that Burrage only sublet space in the premises in order to bring his own rental costs down. Burrage has not cited any prior case in which a tenant was allowed to recover from a commercial landlord for the tenant’s inability to sublet space on account of inadequate heat or air conditioning. Finally, the proof of an inability to sublet space on account of these conditions in the year between November 1993 and November 1994 was inadequate.

Furthermore, with respect to the third claim, Mintz and Burrage were partners in the Rockaway business enterprise. Chapter 93A was intended to redress wrongs between discrete, independent business entities, and was not intended to apply to private transactions within a single company. Puritan Medical Center, Inc. v. Cashman, 413 Mass. 167, 179 (1992), and cases cited. The present allegations that Burrage withheld rent to gain advantages concerning Rockaway “do not even remotely resemble the usual arm’s-length negotiations encompassed by G.L.c. 93A.” Simon v. Simon, 35 Mass.App.Ct. 705, 715 (1994).