Sikora, J.

FINDINGS

In accordance with Mass.R.Civ.P. 52(a), the court finds the following facts to be established by a reasonable preponderance of the evidence.

The Parties and Principals

1. The plaintiff Recoil Management Corporation (“Recoil”) is a Rhode Island corporation and a subsidiary of the Fleet Financial Group. It is a non-bank asset management and collection company. During the early 1990s, it contracted with the Federal Deposit Insurance Corporation (“FDIC”) to collect, manage, and liquidate nonperforming loans which the FDIC had assumed as receiver for failed banks. As this work gradually declined, Recoil reduced its operations and concluded business at or about the end of 1996.
*338 2. The defendant Stone & Webster Engineering Corporation (“SWEC”) is a Massachusetts corporation and an internationally active company engaged in engineering and construction work. It maintains its headquarters at 245 Summer Street, Boston (Suffolk County), Massachusetts. SWEC is one of a family of affiliated entities.
3. Its parent and owner is Stone & Webster, Inc. (“SW, Inc.”), a publicly traded holding corporation. SW, Inc. owns approximately 100 subsidiaries and affiliates.
4. Summer Street Realty Corporation (“SSRC”) is one such subsidiary. It owns the building and grounds at 245 Summer Street.
5. Another pertinent entity is the 245 Summer Street Corporation (“245 SSC”). It is a wholly owned subsidiary of SWEC. The function of 245 SSC has been to provide cleaning, maintenance, and security services for the building at 245 Summer Street.
6. The parent entity SW, Inc. exercised general control over the invoicing, payments, and bank accounts of its subsidiaries and affiliates. Accounting and legal services for these affiliates were located in the SWEC offices at 245 Summer Street.
7. The building at 245 Summer Street had opened in the mid-1970s. SWEC and other affiliates of SW, Inc. had occupied the entirety of the building until the early 1990s.

Formation of the Lease.

8. The expansion of work generated by bank failures as of the early 1990s required Recoil to enlarge its personnel and its office space. In particular, Recoil had executed a five-year contract with the FDIC to collect and manage a body of assets resulting from the failure of the Bank of New England.
9. During the autumn of 1992, Recoil and SWEC negotiated an arrangement for space at 245 Summer Street. The real estate brokerage firm of Meredith & Grew had informed Recoil of the availability of space in early 1992. The tenancy would be the first of its kind at the building. Recoil would be the first company unrelated to SW, Inc. to take space there.
10. As a drafter of provisions for a Lease Agreement, SWEC employed the law firm of Ropes & Gray, and specifically attorney Stephen P. Lindsay, a partner experienced in the composition of commercial leases and a practitioner long familiar with SW, Inc., and SWEC. Lindsay had participated in the negotiation leading to the purchase of the 245 Summer Street parcel by SSR, Inc., from the City of Boston under the terms of G.L.c. 121Ain 1973.
11. In behalf of Recoil, chief executive officer Thomas Lucey participated in leasehold negotiations. General Counsel Andrew Grainger advised Lucey upon matters such as the contemplated lease arrangement. Grainger signed the Lease for Recoil as general counsel and secretary. In addition, the oversight committee of the FDIC gave approval of the transaction.
12. By December 1, 1992, Recoil and SWEC had reached final terms. They executed a Lease Agreement (Exhibit 1) on that day.

The Pertinent Terms of The Lease Agreement

13. Under the Lease Agreement (the “Lease”), (a) the term would extend from January 1, 1993 through May 31, 1996; and (b) the space would consist of 191,103 square feet located on the 10th, 11th, and 12th floors of the building; the space amounted to approximately 22% of the rentable capacity.
14. SWEC had to this point occupied most of the building as a tenant without a written lease with the formal owner, SSR, Inc. Simultaneously with the execution of the Lease with Recoil, it formed a written lease with SSR, Inc. The arrangement with Recoil, then, had the character of a sublease (Trial Exhibit 1, Section 22(b) and sub-Exhibit N thereto).
15. Under the terms, Recoil was obligated to make to SWEC payments of the following character: (a) fixed monthly rent, Lease Section 8; (b) additional rent comprised in the main of a proportionate (approximately 22%) share of property taxes and of “operating expenses”; (c) additional rent comprised of a management service fee of three percent (3%) of the aggregate fixed rent plus property taxes plus operating expenses; and (d) additional rent for certain spaces taken. Lease Sections 9(d); 9(j); and 9(k), respectively.
16. Multiple provisions contributed to the meaning of “operating expenses.”
(a) Under Section 9(d), “ ‘operating expenses’ means all costs and expenses incurred and payments made by Landlord and/or any Landlord parties in connection with the ownership, operation, management and maintenance of the Property and Building . . .” This definitional provision goes on to itemize a set of explicit inclusions, an then a set of explicit exclusions.
(b) The categorical items of inclusion were (i) the costs generated by personnel used for the operation, administration, repair, maintenance, cleaning, management and protection of the building; (ii) the costs of services, utilities, materials, equipment, fuel, and supplies used in the operation, administration, repair, maintenance, cleaning, management, and protection of the building; (iii) the costs of replacements for tools and other similar equipment used in the repair, maintenance, cleaning, management, and protection of the building; (iv) the costs incurred for legal and other professional services related to the normal operation, maintenance, cleaning, repair, and protection of the property; (v) premiums for insurance against damage or loss to the building; (vi) the cost of capital expenditures made for the building; (vii)'the costs of the repair, maintenance, and cleaning of the common areas and common facilities of the building and grounds including the costs of all utilities (fuel, water, sewer, and *339 electricity) charges for those common area purposes; and (viii) the costs of maintenance of the grounds including landscaping and snow removal. Lease Sections 9(d)(i) through (viii).
(c) The categorical items of exclusion were (i) depreciation; (ii) mortgage expenses; (iii) charges generated by any other leases within the building; (iv) costs of additional construction or development of the building; (v) costs generated by the presence of any hazardous materials in the building not attributable to the acts of Recoil; (vi) landlord’s costs of renting any other space in the building; (vii) costs of constructing any improvements whether benefitting Recoil, or not; (viii) costs of any special work benefitting any other tenants in the building; (ix) costs generated by any judgments or liabilities assessed against the landlord for its fault; (x) capital expenditures expanding the building, or benefitting any other tenants, or conferring only decorative value; (xi) “costs relating only to Landlord’s and its affiliates’ tenancy, occupancy and use of the building”; and (xii) “management fees (since Tenant is being charged for such fees outside of the general operating expense calculation pursuant to subsection 9(j)” (parenthetical phrase in the original).
(d) The management fee element of subsection 9(j) appeared in conclusory terms. The term simply called for a “management service fee” payment each month of three percent of the amount of additional rent due for the month. No elaboration or illustrations accompanied it.
17. The Lease set out a process for payment and adjustment of additional rent. Each month SWEC was to estimate and to collect Recoil’s proportionate share of real estate taxes and operating expenses, and the management fee. Within 90 days of the close of each calendar year, SWEC was to provide a statement (prepared in accordance with generally accepted accounting principles) setting out the actual amounts of property taxes and operating expenses accrued for the prior year, the amounts paid by Recoil, and the amounts therefore owing from, or due to, Recoil as a result of any difference between the estimated and the actual costs of real estate taxes and operating expenses. Upon this reconciliation, Recoil then either paid the deficiency or received a credit. Lease Sections 9(g) and 9(h).
18. Recoil was entitled to conduct an annual audit of the data from SWEC. Upon five days notice it could, during the 120 days after receipt of SWEC’s reconciliation statement, at its own expense audit the landlord’s records of taxes and operating expenses. If the audit led to the determination of an overcharge, SWEC had to reimburse that value. If the amount of overcharge exceeded three percent of the proper charge, SWEC was obliged to reimburse Recoil for the cost of the audit, as well. Lease Section 9(h).

The Markup System

19. The tenancy began on or about January 1, 1993. A staff of up to five persons performed the work of cleaning, maintenance, and security at the building for the benefit of the floors occupied by Recoil. The persons included the building manager and his workforce.
20. (a) SWEC carried these cleaning-maintenance- and-securiiy personnel on its payroll in order to enable them to qualify for a bonus program open only to SWEC employees. No separate, necessary or practical reasons caused them to serve as employees of SWEC, rather than of 245 SSC, the maintenance company.
(b)In mid 1995, the building manager and his staff realigned their employment so as to move from the SWEC payroll to the 245 SSC payroll.
21. In its monthly charges to Recoil, SWEC applied the following increments or markups in a process of triangular billing leading to the charge to Recoil.
(a) First, SWEC charged 245 SSC for the salaries and benefits which it (SWEC) paid to the building staff; and it added to the charge a 100 percent margin or increase of the salaries. SWEC viewed the salaries and benefits as a cost which it was bearing in behalf of, or in lieu of, 245 SSC as the suitable or proper functional employer of the building maintenance work force. In effect, they performed their services for 245 SSC. And it viewed the 100 percent margin or markup as a return to which it was entitled upon the expenditure. The origin of the 100 percent markup was the SWEC practice of billing engineering clients at the usual rate of a 100 percent return for services rendered. In particular, SWEC had charged this margin to federal agencies billed in accordance with Federal Acquisition Regulations (“FARs"), a system distinct from Generally Accepted Accounting Principles (“GAAP”). Testimony of SWEC accountant Tim Maloney; SWEC treasurer Stephen Quattrocchi; Exhibits 28, 36A.
(b) In turn, 245 SSC incurred certain costs in the cleaning and maintenance of the building. These included salaries and benefits for its employees, supplies, other disbursements, and the marked up costs passed forward by SWEC. Then 245 SSC consolidated these amounts, added its own 15% markup to the aggregate, and passed the resulting increased amount forward as a charge to SSRC as the owner of the building. The evidence does not contain any explanation of the determination of the 15% figure.
(c) As the third leg of interaffiliate billing, SSRC passed forward to SWEC the marked up aggregate with no further increments. It is undisputed that SSRC had no employees of its own. Accountants working at SWEC performed the calculations needed to sustain SSRC as the formal ownership entity for the building.
(d) Then, SWEC billed Recoil for its proportionate share of additional rent including a proportionate *340 share of the markup amounts as a form of operating expenses under §9(d) of the Lease.
22.The parties stipulated that the markup system resulted in the following incremental payments by Recoil to SWEC during the years of the tenancy (Exhibit 23; and testimony of Mr. Maloney).
Year
1993
1994
1995
1996
Stipulated Sum of Markups
$116,113
$179,396
$102,562
$ 18,466
Markup on Salary Costs of SWEC as % of Sum
22.4%
21.8%
11.1%
2.4%
Markup on All Costs of 245 SSC as % of Sum
77.6%
78.2%
88.9%
97.6%
23. In the regular monthly billings and invoices from SWEC to Recoil, the markup amounts received no explicit itemization.
24. In the course of the negotiation of the Lease the markup process had received no specific identification or discussion. No one on behalf of Recoil was aware of the process at the time of execution of the Lease. Testimony of witnesses Lucey and Grainger. Nor was attorney Lindsay, as adviser and drafter for SWEC, conscious of the system. The practice appears to have been one originally known to and carried out by the accountants serving the affiliated entities.

Discovery of the Markup System

25. In the spring of 1995; the annual reconciliation for calendar 1994 presented by SWEC prompted Recoil to question some of the charges.
26. From late June through early August 1995, Recoil controller Nancy Muldoon pursued the SWEC general counsel and vice president in charge of real estate by correspondence to arrange for an audit as authorized by the terms of the Lease.
27. The audit proceeded through the late summer and fall of 1995, and culminated in January of 1996. At a meeting between officers of the companies on January 5, 1996, Recoil reported its discovery of the markups, challenged their validity, requested credits for the amounts paid for calendar 1993 and 1994, and requested their elimination by a new methodology for calendar 1995 and 1996. The audit had cost Recoil approximately $10,000. During the course of the audit, SWEC prevented Recoil audit personnel from inspecting pertinent records (relating to the markup pass-through mechanism) of 245 SSC. This resistance (presented on the ground that the Lease literally authorized inspection of records of SWEC and not of the affiliate 245 SSC) delayed the audit by approximately two months (the interval of October and November of 1995). The full data needed to substantiate the nature and quantity of the markups did not reach Recoil until on or about December 22, 1995.
28. The tenancy continued into its final year of 1996 without resolution of the markup dispute.

Modification of the Lease

29. Meanwhile, the volume of Recoil's work had begun to decline. It had anticipated this probability by a provision in the Lease. Section 7 allowed Recoil a “reduction option” as of December 1, 1995. The tenant could give notice by December 1, 1994, of its desire to eliminate 31,851 rentable square feet of space on the 12th floor as of December 1, 1995; and could do so upon payment of a lump sum of $35,832.30 to the landlord.
30. However, the parties bypassed this provision and undertook discussions of an amendment to the Lease during the summer of 1995.
31. Those negotiations resulted in the execution of a First Amendment to the Lease, dated December 27, 1995, signed by S. Paul Werzanski as vice president of SWEC and by Michael J. Hullinger as president of Recoil. Trial Exhibit 25. Several of its provisions are pertinent to the dispute over the markup operating expenses then recognized by SWEC and Recoil.
(a) In a prefatory clause, the parties recited, “WHEREAS, Tenant has disputed Landlord’s calculation of certain aspects of Additional Rent, and Tenant and Landlord desire to resolve all such disputes pursuant to the Terms of this Amendment ...”
(b) Section 6 of the Amendment addressed SWEC’s entitlement to the three percent management fee created by Lease Section 9(j) and connected it to the markup dispute. SWEC in the opening clause apparently waived the right to collect additional amounts of the Section 9(j) management service fee for the period January 1, 1993 through December 31, 1994. Then came the following clause: provided, however, if it is finally determined that Landlord has overcharged Tenant for . . . operating expenses related to such period, the additional amount which Landlord would otherwise be entitled to collect from Tenant for management service fees under subsection 9(j) of the Lease for such period shall. . . [intervening references to calculations incomprehensible by reason of turgid grammar] be applied against the total amount of that overcharge.
(c) Section 7 of the Amendment confirmed the correctness of SWEC’s computation of the electrical expenses for calendar 1994 as a component of operating expenses in accordance with Lease Section 9(d)(vii) so that “Tenant shall have no right to assert that Landlord has overcharged Tenant for operating expenses” as a result of the inclusion of that amount in the calculation of operating expenses for calendar year 1994.
(d) Finally, in Section 14 of the Amendment, “Each party acknowledges that, to the best of its knowledge, the other is not in default under the Lease.”
(e) In substance, the remaining provisions of the First Amendment ratified or accomplished the surrender or “give back” of portions of space now excessive to Recoil’s needs; confirmed the payment of the reduc *341 tion fee of $35.832.38 to SWEC; affirmed the obligation of Recoil to pay certain ongoing monthly termination fees through May 31,1996, and to pay scheduled charges for restoration of surrendered areas; and addressed other subjects unrelated to the markup dispute.
(f) As a mixed determination of law and fact, I find that these pertinent provisions of the First Amendment did not resolve the question of the validity of the markup charges. The preamble clause expressed the aspiration to solve the problem, and not the accomplishment of a solution. The non-default sentence of Section 14 carries the critical qualifier, “to the best of its knowledge.” Section 6 expressly refers to the calculation of “operating expenses” as an ongoing and unfinished process. And Section 7, in an illustrative contrast, shows by definite language the resolution of the question of electrical expenses as an element of the larger and still open subject of a proper “operating expense” definition and calculation under Lease Section 9(d). No comparable language, of course, appears concerning the markups.
32. Finally, the timing of events is relevant. As of the execution of the Amendment on or about December 27, 1995, the audit for 1994 was still not completed and communicated from Recoil to SWEC. That process occurred between January 6 and 22, 1996. See Exhibits 10, 50. Consequently, the parties did not have final knowledge of the quality and quantity of the markup disagreement as a basis for the exchange or bargain embedded in the First Amendment which appears to have reached its final written form for execution on or about December 19, 1995. (Exhibit 24, cover letter from SWEC administrative assistant [to Mr. Werzanski] Kay LoGuidice to attorney Dunn in behalf of Recoil, accompanying the final version of the First Amendment.) When the parties in Section 14 of the Amendment used the qualification “to the best of [their] knowledge,” they were referring to genuinely incomplete knowledge at the moment of the formation of the Amendment.

The Further Audits for Years 1995 and 1996

33. With the markup dispute still unresolved and with the present litigation underway, Recoil in 1998 retained the accounting firm of Toñas, Fleishman, Shapiro & Company (“TFS") to conduct an audit of the leasehold finances for the calendar years 1995 and 1996. The markups for those years remained contested items. The tenancy had reached its agreed termination on May 31, 1996.
34. That audit addressed a second significant dispute arising shortly after the completion of the tenancy. SWEC claimed that Recoil owed substantial residual amounts under the Lease. In July 1996, SWEC identified the amount as $605,141.68. In September 1997, it adjusted the claimed amount to $425,370. Recoil responded that, wholly apart from the outcome of the markup dispute, it did not owe SWEC any amounts under the Lease and Amendment; and that, to the contrary, SWEC owed Recoil a net amount after all proper computations and adjustments. See Exhibit 21.
35. After some preliminary skirmishing with SWEC personnel, the TFS auditors began work on or about March 10,1998. They finished their work by the close of April. The parties were not able to use the second audit results for constructive negotiation or settlement purposes before the beginning of trial on May 19, 1998.
36. TFS charged, and Recoil paid, $13,468 for the audit work. Exhibit 35.

The Separate Issue of Lease Overpayment or Underpayments

37. In March or early April of 1996, SWEC senior accounting supervisor Timothy Maloney reviewed the monthly billings and payments from Recoil to SWEC for the 12 months of calendar 1995. His month-by-month comparisons of the aggregate billing for (1) fixed rent, plus (2) parking, plus (3) real estate taxes and operating expenses with the actual amounts incurred and due for those items showed a substantial ongoing discrepancy from January through December for the items of real estate taxes and operating expenses; and a substantial discrepancy for the item of fixed rent for the months of August through December; and miscellaneous smaller discrepancies. In toto, the excess of billed amounts over actual entitlement of SWEC added up to $603,390.85. See Exhibit 19A. For the calendar year, SWEC had billed Recoil a total of $2,716,160.68. The proper accurate billing should have been $2,112,769.83; hence, the overbilling of $603,390.85. Recoil had made payments of $2,426,260.69. Therefore, the data indicated an entitlement to a credit of $313,490.86. See Exhibit 19A, the “Totals” file across the bottom.
38. Maloney on April 15, 1996, forwarded the results of this analysis to SWEC vice president Werzanski with a proposed credit memo of that same date in behalf of Recoil in the amount of $313,490.86. See Exhibit 42, front and third pages. [Maloney had also computed a credit entitlement for Recoil for calendar 1996 in the amount of $117,355.92; had reported that fact to Werzanski in the same memo of April 15, 1996; and had attached a similar prepared credit memo for transmittal to SWEC’s executive department; see Exhibits 19B and 42 first and second pages, respectively.]
39. Werzanski did not forward Maloney’s information or work products to Recoil; nor did he cause any corresponding adjustment to SWEC’s records or credits for Recoil’s benefit.
40. During the summer of 1996, Werzanski continued to maintain that Recoil owed SWEC substantial amounts from the now completed tenancy, in discussion and by correspondence with Andrew Grainger. By *342 letter of July 9, 1996, Werzanski asserted that Recoil owed SWEC $605,141. See Exhibits 34; 17.
41. Additional exchanges of claims occurred between the parties during November of 1996. Exhibit 18.
42. (a) SWEC delivered a late annual reconciliation for calendar 1995.
(b) It never provided Recoil a reconciliation for calendar 1996.
43. The parties continued to dispute the issue of overpayment/underpayment throughout 1997. In April of 1997, Mr. Maloney asserted the amount of underpayment to lie in the vicinity of $300,000; in September, he estimated it at $427,370. Maloney trial testimony. That estimate appeared also in a litigation affidavit dated February 17, 1998. Exhibit 22.
44. In the pleadings in this litigation begun in late July 1996, SWEC continued to pursue a cause of action for underpayment of Lease amounts by means of a continuing counterclaim maintained up to the time of trial in late May of 1998. [SWEC filed an amended counterclaim after trial on June 8, 1998, nunc pro tunc or retrospectively in response to the amended complaint allowed by a motion judge to Recoil in late February of 1998. However, as described immediately below, by the beginning of trial on May 18, 1998, the parties had stipulated to the net result of the overpayment/underpayment dispute.)
45. Finally, as part of a Stipulation As To Damages submitted by the parties at trial, SWEC acknowledged that Recoil had made leasehold overpayments in the amount of $300,827; and Recoil conceded that it owed SWEC an offset charge of $134,119 for electricity, reprographics, and other requested services, so as to render a net entitlement for overpayment in behalf of Recoil in the amount of $166,708. Exhibit 23.
46. Throughout a substantial period leading up to trial, including 1997 and a period into 1998, SWEC did not disclose to Recoil Mr. Maloney’s analysis of credits due to Recoil for calendar 1995 and 1996, as computed and proposed by him to vice president Werzanski on or about April 15, 1996.

The Alleged Markup Benefits

47. In rebuttal or surrebuttal testimony, as the result of questions to counsel by the court in the course of this bench trial, treasurer Stephen Quattrochi in behalf of SWEC undertook a calculation of benefits traceable from the 15% markup charged by 245 SSC to SSR Corporation and then passed through to SWEC as landlord and to Recoil as tenant. Mr. Quattrochi testified that 69% of the 15% markup generated benefits to Recoil as a tenant. Upon close examination of that reasoning and computation, I am not satisfied by a preponderance of the evidence of any genuine incremental benefit to the tenant. The analysis is too loose fitting. It does not tightly and reliably connect the posited employee expenses specifically to those employees performing work of cleaning, maintenance, and security service to the tenant at 245 Summer Street. It appears also, as Recoil points out, to include administrative costs beyond those necessary for the employment of the building staff and in any event covered by the separate administrative service fee provision of Section 9(j) of the Lease.

RULINGS OR CONCLUSIONS OF LAW

In accordance with Mass.R.Civ.P. 52(a), the court enters the following conclusions and reasoning as the rulings of the case.
I. SWEC’s Markup Charges to Recoil The Text of the Lease
1. SWEC’s assessment and collection of the markup charges to Recoil throughout the tenancy were unauthorized by the Lease. This conclusion rests upon multiple grounds.
2. First, the language of the Lease, read as an unambiguous text, does not permit such charges and contradicts any reasonable inference of their allowance.
(a) The interpretation of an unambiguous contractual document is a question of law for the court. See, eg., Robert Industries, Inc. v. Spence, 362 Mass. 751. 755 (1973); Lewis v. Commonwealth, 332 Mass. 4, 6 (1954); and Edwin R. Sage Co. v. Foley, 12 Mass.App.Ct. 20, 28 (1981). The preliminary issue of the existence of an ambiguity is itself a question of law for the judge. Frank Construction Corp. v. Republic Powdered Metals, Inc., 11 Mass.App.Ct. 972 (1981). In an abundance of caution I will analyze the pertinent language as unambiguous expression; and in the alternative I will treat the pertinent language as la-tently ambiguous and for assistance consult sources outside the document as they developed in evidence at trial.
(b) Section 9(d) defined “operating expenses” as “all costs and expenses incurred and payments made” by the landlord for purposes of “ownership, operation, management and maintenance” of the building.
(i) It went on to itemize illustrative operating expenses generated by personnel, supplies, equipment, legal and professional services, insurance premiums, certain capital expenditures, and common area upkeep, necessary to maintain the building. See Finding 15(b); and Lease Sections 9(d)(i)-(viii).
(ii) This inclusionary list specifically excepted certain items; (1) prorated personnel expenses for employees working in part for the benefit of other buildings, Section 9(d)(i), final clause; (2) electrical costs created by the “Landlord parties to conduct business unrelated to the administration and generation of the Building,” Section 9(d)(ii); professional fees and commissions caused by acquisition or eviction of other tenants, or “not directly related to the normal operation, maintenance, cleaning, *343 repair, and protection of the Property,” Section 9(d)(iv).
(iii) It proceeded to itemize illustrative excluded expenses. These consisted of depreciation; mortgage expenses; charges generated by any “other” leases within the building; the costs of any additional construction or development of the building; costs generated by the presence of any hazardous materials in the building not traceable to Recoil; the landlord’s costs of renting any “other” space in the building; the costs of constructing any improvements “whether for [Recoil] or any other tenant”; the costs of any special work benefitting “particular tenants”; the costs of judgments or liabilities for which the landlord was responsible; capital expenditures expanding the building, benefiting exclusively a particular tenant “(including Landlord and its affiliates where it or they are tenants or they are tenants or occupants)” [parentheses original, Section 9(e)(x)[; “costs relating only to Landlord’s and its affiliates’ tenancy, occupancy and use of the ’’Building"; and “management fees” redundant of the general three percent allowance of Section 9(j). Section 9(e)(xi). See Finding 15(c) above.
(c) Section 9(j) authorized in broad terms a “management service fee” in the amount of three percent of the aggregate fixed rent, apportioned property taxes, and apportioned operating expenses. By reasonable inference, I construe the “management service” to mean reasonably necessary administration of the building and its tenancies.
3. The language of these integrated sections of the Lease carries two emphatic themes: (a) that an “operating expense” constitutes a genuine outlay “incurred” or paid by the Landlord for a useful good or service, Sections 9(d), (i)-(viii); and (b) that the good or service must benefit Recoil, Sections 9(d)(i), (ii), (iv), final clause limitations; and Sections 9(e)(i)-(xii). SWEC is then entitled to recapture that expense from Recoil. Recoil by Lease language strove to repel responsibility for any expense unrelated to its benefit or fault. The markup charges met neither of the themes or criteria.
(a) The markups did not embody actual outlays; and they did not bring useful goods or services to Recoil. SWEC did not spend the money comprised of its 100% markup of the salaries of the maintenance personnel passed forward to 245 SSC; and 245 SSC did not spend the money comprising its cumulative 15% markup to SSRC. The markup had the character of an arbitrary profit margin, and not the character of the recovery of a useful expenditure. The 100% markup figure derives from a customary profit margin charged to engineering clients by SWEC, most commonly to federal agency clients under the FARs standards. The 15% markup figure received no rational explanation from the evidence.
(b) The markups did not purchase any real-world or marketplace goods and services; they functioned simply as accounting-world conventions between affiliated entities operating at less than arm’s length. Consequently, they provided no incremental benefits to Recoil. Recoil received the same unchanging quantity and quality of cleaning, maintenance, and security work from the building staff with or without the markups.
(c) An illustration of the artificiality of the markups arises from the changing employment status of the building staff. In 1993, 1994. and part of 1995, they functioned as employees of SWEC so that they could qualify for certain bonuses unrelated to the tenancy of Recoil. During this period, and as a result of this arrangement, SWEC applied the 100% markup to its billing of 245 SSC, the more appropriate or suitable employer of the staff. The markup passed forward as an additional cost to Recoil. In 1995, the staff became employees of 245 SSC. The markup, therefore, diminished or ceased. Nothing changed in the actual marketplace of goods, services, and genuine costs. Recoil received the identical maintenance services or benefits. The markup disappeared as the consequence of an accounting adjustment.
(d) In sum, the plain and cumulative meaning of the terms embodied in Section 9(d) and 9(e) of the Lease is that operating expenses must be actual outlays for goods and services benefitting Recoil and entitling SWEC to their recapture; and that profit margins above those embodied in the fixed rent, parking, and management service fee are not contemplated or agreed to by Recoil.
4. Several other textual sources converge in this conclusion.
(a) Under the canon of eiusdem generis applicable generally to the language of legal instruments from constitutions to contracts, the interpreter of a generic or open-ended term accompanied by an enumeration of specific examples is entitled to conclude that the open term carries a meaning of the same kind or quality as the specific examples. See Boston Association of School Administrators & Supervisors v. Boston Retirement Board, 383 Mass. 336, 341 (1981); and Dickson v. Riverside Iron Works, Inc., 6 Mass.App.Ct. 53, 55-56 (1978). If one applies that guideline to the concept of “operating expenses” materializing in Sections 9(d)(i)-(viii), the dissimilarity of the markups from all other illustrations of an operating expense eliminates them from plausible inclusion in that concept.
(b) Section 9(d), final paragraph immediately following those examples states, “All Operating Expenses shall be determined and accounted for by generally accepted accounting principles.” SWEC did not offer any evidence that the markup system accorded with generally accepted accounting principles (“GAAP”).
(c) The management service fee created by Section 9(j) also militates against the inclusion of markups as independent operating expenses. The most natural *344 meaning for management services would be general administrative work required by the tenancy. To the extent that SWEC attempted to define management services as supervisory work by the maintenance crew-manager. the performance of SSRC (a paper corporation without employees) paperwork by the affiliate companies (testimony of Mr. Quattrochi on the sixth and seventh days of trial), those services would appear to cover the kind of administrative activity which SWEC characterizes also as markup services. On the seventh day of trial, Mr. Quattrochi testified that 69% of the 15% markup was traceable to Recoil as a benefit conferred by services of a legal, insurance, human resources, and accounting character in support of the tenancy. I view these activities as general management sendees, especially since they receive no other definition in the Lease provisions written by SWEC. In neither the Lease nor testimony did SWEC differentiate alleged markup services from 9(j) management services. They appear to be one and the same. Their explicit designation in Section 9(j) precludes their redundant implicit inclusion in Section 9(d).
(d)In several of the Section 9(d) and 9(e) excluded particulars, Recoil expressed its avoidance of any costs generated merely by the nominal relationships among the “Landlord parties” or “affiliates.” See §§9(d)(ii); 9(e)(x); 9(e)(xi), all referenced in Rulings 2(b)(ii) and 2(b)(iii) above. The markups have the character of just such inter-affiliate activity lacking any incremental benefit for the tenant.
5. In the alternative, one may view the term “operating expenses” as latently ambiguous. It does express a general concept of economic or accounting character. Like most concepts of that nature, it may have some arguably inevitable ambiguity. To resolve a latent ambiguity in a contract, the court may view the document as whole in order to shed light on a disputed term, Glick v. Greenleaf, 383 Mass. 290, 296 (1981); and may examine the circumstances of the. formation of the agreement in order to discover the objectives of the parties, Shea v. Bay State Gas Company, 383 Mass. 218, 222-23 (1981); DeFreitas v. Cote, 342 Mass. 474, 476-77 (1961); Wood v. Ray Lapidus, Inc., 10 Mass.App.Ct. 761, 764 (1980); and Fay, Spofford & Thorndike v. Massachusetts Port Authority, 7 Mass.App.Ct. 336, 341-42 (1979). I have analyzed the provisions of the Lease as a whole pertinent to the meaning of “operating expenses” already. It remains to examine the circumstances of the formation or negotiation of the agreement; and the objectives and intentions of the parties evident in that process.
(a)Recoil’s objective was to minimize operating expenses. In the testimony of then president Thomas Lucey and of counsel and vice president Andrew Grainger, it accepted the definition of operating expenses as an ingredient of additional rent because it was relying upon an apparent shared interest of SWEC and Recoil in the containment of operating expenses. If the typical elements of those expenses [as itemized in Section 9(d)(i)-(viii)] remained low for SWEC as landlord, they would remain proportionately low for Recoil as tenant. This rational goal is obviously credible.
(b) In the testimony of attorney Lindsay as drafter for SWEC, the purpose of the phrase “operating expenses” was to include as comprehensively as possible all costs incurred by SWEC in the maintenance of the tenancy. In his extensive experience of commercial lease drafting in this market (at least 17 years as of trial time), the commercial landlord drafted the concept broadly and left to the tenant the task of carving explicit exceptions out of the general concept of all leasehold maintenance costs. He followed that practice or custom in the creation of this Lease. He was not aware of the markup system to be employed by SWEC in the tenancy.
(c) The markups received no explicit mention in the text of the Lease. The actual drafters and negotiators did not discuss them. The markups constituted foreseeably appreciable amounts. Still, they did not appear in any billings or invoices to Recoil. Only the subsequent first audit uncovered them.
(d) In the following respects, this extrinsic evidence of the parties’ intentions, understandings, and objectives at the formation of the Lease weighs strongly against SWEC for the resolution of any arguable ambiguity. (i) SWEC was the author of the term “operating expenses” and is the proponent of the inclusion of the markups. Under the usual canon, all ambiguities on this point will be resolved against it. Slater v. United States Fidelity & Guaranty Company, 379 Mass. 801, 804 (1980): Merrimack Valley Nat’l Bank v. Baird, 372 Mass. 721, 724 (1977); and Republic Pipe & Supply Corp. v. Marnell Construction Corp., 5 Mass.App.Ct. 848 (1977). It had the burden of clear expression upon an element of the agreement important to it and burdensome to the other contracting party. It could not leave a material term hidden in a general phrase. It failed to carry the burden of clear expression.
(e) The contrary inference available from attorney Lindsay’s testimony is not plausible: that Recoil had the burden of negotiating the markup element out of the Lease. This position is sophistical because at the time of execution Recoil had no reason to know of the markup system, let alone to negotiate about it. Indeed, even Lindsay did not know of it as SWEC’s draftsman.
(f) Another inference from attorney Lindsay’s testimony is that the inclusion of such markups might constitute custom or usage incorporated into the Lease Agreement. However, the rule is that an industry custom or usage assimilated into a contract to supply a missing term must be known to the parties. Baccari v. A. Perini & Sons, Inc., 293 Mass. 297, 303-04 (1936); Liberty Bank & Trust Co. v. Lipshutz, 5 Mass.App.Ct. 831, 832 (1977); and Hardware Specialties, Inc. v. Mishara Construction Co., Inc., 2 Mass.App.Ct. 277, *345 280 (1974). Here, even if one could find a term to be missing, the inserted usage of markups was not known to Recoil.
(g) In these circumstances, no meeting of the minds could have occurred upon the markup system. No enforceable agreement arose for their payment. Berkshire Mutual Insurance Co. v. Burbank, 422 Mass. 659, 661 (1996); George Wilcox, Inc. v. Shell Eastern Petroleum Products, Inc., 283 Mass. 383, 390 (1933).

SWEC’s Claim of Waiver

6. By its agreement to the First Amendment to the Lease, Recoil did not waive its objection to the markup system; nor did it estop itself from reclaiming the markup payments.
(a) The terms of the Amendment itself make clear that the parties were reserving disputed amounts of payment and were acting on still incomplete knowledge. The results of the first audit did not materialize until January of 1996, or shortly after the formation of the Amendment in December 1995. Findings 31(a)-(f) and 32, above.
(b) As Recoil correctly points out, the Massachusetts courts define waiver as the voluntary relinquishment of a known right. Niagara Fire Insurance Co. v. Lowell Trucking Corp., 316 Mass. 652, 657 (1944); and St. John Bros. Co. v. Falkson, 237 Mass. 399, 402 (1921). The First Amendment does not approach such conduct.
(c) Estoppel is conduct or inaction reasonably leading, or misleading, an adverse party into detrimental reliance. Jet Line Services, Inc. v. American Employers Insurance Co., 404 Mass. 706. 713 (1989). The First Amendment could not reasonably lead SWEC to believe that Recoil was surrendering its claim against the markups. Nor does any evidence show detrimental reliance by SWEC upon such a belief.
II.Recoil’s Entitlement to the Recovery of Its Separate Overpayment of Rent
7. (a) By stipulation at the time of trial, the parties agreed that, apart from the markup dispute, Recoil was entitled to a net recoupment of $166,708 in overpaid rent. Exhibit 23. The court adopts that stipulation as a ruling of law. I will address the character of this recovery as a chapter 93A matter in a separate section below.
(b) The stipulation effectively waives SWEC’s counterclaim of a net underpayment of rent and/or charges.

III.Recoil’s Claims for Reimbursement of the Costs of the Two Audits

8. Under Section 9(h) of the Lease, Recoil was entitled to reimbursement for the cost of an audit demonstrating an overcharge upon a disputed item in excess of three percent of the correct charge.
9. (a) The first audit addressing the accuracy of the 1994 rent charges revealed that the markup for that year (and inferably for calendar year 1993) had imposed an excessive charge of $179,396 (and inferably a corresponding excessive charge of $163,113 for calendar year 1993). The overcharge for 1994 exceeded three percent of the correct operating expenses. (See Exhibit 23, a compilation by SWEC accountant Maloney indicating that the 1995 Sections 9(c) and 9(d) additional rent amounted to approximately $1,327,750 inclusive of real estate tax share. I infer a similar additional rent sum for 1994, and therefore, a similar ratio of overcharge to correct operating expenses well above three percent.)
(b) The first audit cost Recoil $10,000. It is entitled to reimbursement of that amount with appropriate interest.
10. (a) The second audit conducted by Toñas, Fleishman, Shapiro & Co. for calendar years 1995 and 1996 addressed the issue of markup overcharges for those years and the independent dispute concerning possible overpayment of separate rental amounts by Recoil. Recoil did not communicate its intent to conduct that audit until October 27, 1997, a point beyond the time limits set by Section 9(h) of the Lease. However, that tardiness may be forgivable because SWEC did not furnish Recoil the required conciliation for its tenancy through May 31 of 1996. Rather than hinge this item upon the arguable operation of Section 9(h) in the circumstances, I conclude preferably that, as a matter of common law and common sense, the cost of an audit by Recoil became a natural, foreseeable, and inevitable consequence of the claimed markup overcharges during the last two calendar years of the tenancy and of the claimed separate overpayment through the end of the tenancy. In the circumstances and experience of the parties, the cost was a reasonably foreseeable incidental element of compensatory damages resulting from any breach of the Lease by SWEC. See Air Technology Corp. v. General Electric Co., 346 Mass. 613, 626-27 (1964) (authorities collected).
(b) The second audit cost SWEC $13,468. SWEC is entitled to recover that amount with appropriate interest.

IV.The Chapter 93A Claims

11. Under G.L.c. 93A, §2, an unfair or deceptive act or practice typically consists of a common law wrong (though not always) and of some additional degree of immoral, unethical, oppressive, or unscrupulous conduct. See PMP Associates, Inc. v. Globe Newspaper Co., 366 Mass. 593, 595-96 (1975); and Levings v. Forbes & Wallace, Inc., 8 Mass.App.Ct. 498, 504 (1979). The determination is necessarily circumstantial. See Doliner v. Brown, 21 Mass.App.Ct. 692, 698 (1986); and Levings, supra.
12. Authority has accumulated to demonstrate that bad faith contractual breaches intentionally designed to achieve undeserved benefits for the violator will constitute a recognized species of chapter 93A miscon *346 duct. See Massachusetts Employers Insurance Exchange v. Propac-Mass, Inc., 420 Mass. 39, 43 (1995); Anthony's Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 474 (1993); Wang Labs, Inc. v. Business Incentives, 398 Mass. 854, 857 (1986); and Atkinson v. Rosenthal, 33 Mass.App.Ct. 219, 226 (1992).
13. Authority has grown also in support of a second species of chapter 93A wrongdoing: acts or practices of an extortionate or coercive character designed to extract concessions from an adversary by intentional denial of payments or benefits to which he is entitled. See Massachusetts Employer, supra; Anthony’s Pier Four, Inc., supra; Wang Labs, Inc., supra.
14. Upon the findings and pertinent law, SWEC’s pattern of conduct does constitute an unfair practice within the meaning of G.L.c. 93A, §2. Specifically, the accumulation of (a) undisclosed markup charges, (b) inaccurate and self-serving calculations of separate rental charges, and (c) slow, if not footdragging, responses to Recoil’s requests to resolve the issues of excessive charges over several years has passed well into the zone of repetitive unfairness. Accordingly, Recoil shall be entitled to an award of reasonable attorneys fees and costs for the present litigation, as authorized by G.L.c. 93A, §11.
15. The question remains whether SWEC’s misconduct was “willful or knowing” within the meaning of G.L.c. 93A, §11, so as to trigger an award of multiple damages.
(a) As to the markups, the evidence has not uncovered a particular individual or individuals coherently installing and concealing the practice. SWEC’s unacceptable rationale — that it customarily passed on such markups to engineering clients (actually a slightly higher markup of about 112%) — gives the practice the appearance of accountants’ imprudence, rather than of premeditated deceit. Recoil was the first commercial tenant at 245 Summer Street since its inception almost 20 years earlier. That circumstance gives the benefit of some doubt to its accounting practice at the building. Its dilatory responses to Recoil’s audit effects are not enough to establish the markups as a wilful or knowing deception. In sum, the markup system was not a wilful or knowing violation of c. 93A, §2. Consequently, the markup damages amounts and the audit cost damage amounts will remain single or basic.
(b) The question of wilfulness is closer for the issue of the overpayment of separate rental charges by Recoil. The circumstantial evidence gives color to a finding that vice president Werzanski suppressed the report of accountant Maloney or about April 15,1996, that SWEC had overcharged, and owed credits to, Recoil for calendar years 1995 and 1996, in the amounts of $313,490.86 and $117,355.92, respectively; and that Werzanski prolonged the overall reconciliation negotiations by that concealment to the time of trial two years later.
At the outset of trial, SWEC conceded certain calculation errors and settled the separate rent dispute by acknowledgment of a net liability of $166,708; so as to eliminate the need for litigation of liability and damages upon that issue.
SWEC has argued that Werzanski employed the separate rent claim (the assertion of a total underpayment or deficit on Recoil’s part in amounts ranging from $605,141 to $300,000) for bargaining leverage in order to extort or to coerce a better settlement of the markup dispute.
SWEC did not offer Werzanski as a witness at trial, even though the circumstances called for some responsive information from him and even though the evidence therefore permits adverse reasonable inferences from his absence. See Grady v. The Collins Transportation Co., Inc., 341 Mass. 502, 504-10 (1960).
At the same time, Recoil did not subpoena Werzanski to trial and subject his credibility to cross-examination for a better informed finding of scienter or wilfulness on my part.
As an additional pertinent circumstance, I note that the separate rent reconciliation involved a number of substantial variables other than the overcharges reported by Maloney in his April 15, 1996 memorandum, including lease-end restoration costs, unspecified “requested services,” and additional ingredients not offered into evidence but leading to the net reconciliation figure of $ 166,708. At the time of reconciliation at trial, the agreed overpayment by Recoil was $300,827, to be reduced by recognized offsets to SWEC of $134,119. The trial evidence does not describe the evolution of those final figures in May of 1998 from the overpayment credits of $313,490.86 and $117,355.92 proposed by Maloney in April of 1996 and inferably concealed by Werzanski thereafter.
In these circumstances, SWEC’s treatment of the separate rent issue denied Recoil the use of the $166,708 for a period extending from about 90 days after the conclusion of the tenancy on May 31, 1996, or September 1, 1996, to the time of trial in late May of 1998.
In the absence of credibility evidence from Werzanski and in the absence of greater detail of the components of the $166,708 reconciliation, I conclude that the evidence falls narrowly short of the reasonable preponderance necessary for a finding of wilful or knowing deprivation by SWEC of Recoil’s entitlement to the refund of separate rental payments.
Accordingly, Recoil’s recovery of this item will remain single or basic.
V. Computation of Interest
16.In accordance with G.L.c. 231, §6C, Recoil is entitled to interest upon the improper markup amounts from the time of the respective breach or moment of improper retention of those figures as they *347 should have been known to SWEC. Under Section 9(g) of the Lease, SWEC was obliged to furnish Recoil with an accurate reconciliation of all payments and obligations as of 90 days from the end of each respective calendar year. Therefore, Recoil is entitled to statutory interest of 12% simple from April 1 onward for the improper markup amount for each preceding calendar year of the tenancy (as itemized below in the order for judgment).
17. Also, in accordance with G.L.c. 231, §6C, Recoil is entitled to statutory prejudgment interest of 12% upon the costs of the audits conducted under Section 9(h) of the Lease. Payment for those costs would have been due reasonably soon after the presentation of the audits. For the first audit (of the 1994 calendar year) that due date would have been approximately March 1, 1996. For the. second audit (of the 1995 and 1996 data), that due date would have been approximately July 1, 1998.
18. In accordance with G.L.c. 231, §6C, Recoil is entitled to statutory prejudgment interest of 12% upon the amount of $166,708, from the point at which SWEC should have discovered that amount to be due. The literal terms of the Lease allowed SWEC 90 days beyond the close of the final calendar year of 1996, or until April 1, 1997, for delivery of an accurate reconciliation. Statutory interest will run from that point, rather than from April 15, 1996 (the date of Maloney’s proposal of credits to Werzanski) because the accurate net conciliation figure (involving other variables) did not come to rest until considerably later and did not have to reach an end under the Lease until April 1, 1997.

ORDER FOR JUDGMENT

Judgment shall enter as follows. The provisions of the judgment conclude all claims and counterclaims of the action except for a determination of the amount of reasonable attorneys fees and costs to be awarded to the plaintiff after submissions by the parties.
1. (a) Judgment for the plaintiff for compensatory damages in the amount of $ 163,113 with prejudgment interest pursuant to G.L.c. 231, §6C, at the rate of 12% simple from April 1, 1994, onward.
(b) Judgment for the plaintiff for compensatory damages in the amount of $ 179,396 with prejudgment interest pursuant to G.L.c. 231, §6C, at the rate of 12% simple from April 1, 1995, onward.
(c) Judgment for the plaintiff for compensatory damages in the amount of $ 102,562 with prejudgment interest pursuant to G.L.c. 231, §6C, at the rate of 12% simple from April 1, 1996, onward.
(d) Judgment for the plaintiff for compensatory damages in the amount of $18,466 with prejudgment interest pursuant to G.L.c. 231, §6C, at the rate of 12% simple from April 1, 1997, onward.
2. Judgment for the plaintiff for compensatory damages in the amount of $166,708 with prejudgment interest pursuant to G.L.c. 231, §6C, at the rate of 12% simple from April 1, 1997, onward.
3. (a) Judgment for the plaintiff for compensatory damages in the amount of $10,000 with prejudgment interest pursuant to G.L.c. 231, §6C, at the rate of 12% simple from March 1, 1996, onward.
(b) Judgment for plaintiff for compensatory damages in the amount of $13,468 with prejudgment interest pursuant to G.L.c. 231, §6C, at the rate of 12% simple from July 1, 1998, onward.
4. Judgment for the plaintiff for an entitlement to an award of reasonable attorneys fees and costs pursuant to G.L.c. 93A, §11, the amount to be determined and entered after relevant submissions by counsel (as directed by a separate procedural order).
5. Judgment for the plaintiff Recoil Management Corporation and against the defendant/counterclaim-ant Stone & Webster Engineering Corporation upon Stone & Webster’s counterclaim.
6. Judgment shall become complete and final for appellate purposes upon entry of the amount of the award of attorneys fees and costs declared in paragraph 4 above.