Quinlan, Regina L., J.
This case arises from a dispute concerning two leases controlling the use of property occupied by T.W. Nickerson, Inc. (the “plaintiff’) in South Chatham, Massachusetts (“the property”). At all times material, the property was owned by the Fleet National Bank, as trustee of the Theodore W. Nickerson Trust (“the trust”). In July 2002, the plaintiff brought this action against the defendants, Fleet, as trustee, and against the children of Theodore W. Nickerson and the beneficiaries of the trust, Edmund Nickerson, Kenneth Nickerson, Theodora Bur-son, and Diana Lapham (collectively, “Defendant Beneficiaries”). The leases at the center of this dispute contain provisions granting the lessee the “option to renew” and the “right of first refusal.” The plaintiff alleges breach of the implied covenants of good faith and fair dealing by the defendants regarding the plaintiffs rights under these provisions, and the damages resulting therefrom.
Trial, without ajuiy, was held August 29, 2005 to September 2, 2005. After this trial, and based upon all of the credible evidence, the Court makes the following findings of fact and rulings of law.

FINDINGS OF FACT

Based upon all of the credible evidence introduced at the juiy-waived trial of this complaint, the Court makes the following findings of fact and rulings of law.
The plaintiff, T.W. Nickerson, Inc. is a Massachusetts corporation organized in December of 1962. The original incorporators were Theodore W. Nickerson (“Theodore”), his wife Lillian M. Nickerson (“Lillian”) and their sons Edmund J. and Kenneth W. Nickerson. *283 The corporation operated a stump dump at its place of business at 160 Mill Hill Road in Chatham.
Theodore also owned the property where the corporation had its offices and operated its business. On June 29, 1982, Theodore executed a declaration of trust conveying the real estate to the First National Bank of Boston, as Trustee of the Theodore W. Nicker-son Trust, on his death for the benefit of Lillian. Their four children, Edmund, Theodora, Diana, and Kenneth, were the residuary beneficiaries.
In 1991, Theodore sold the corporation to his nephew Donald F. Nickerson (“Donald”). In 1993, Donald sold all of the stock in the corporation to Steven T. Clark (“Clark”).[3] As a result of the purchase, Clark became the president and treasurer of the corporation. He has held those offices throughout this litigation.[4]
On June 17, 1993, the First National Bank of Boston executed two leases to the corporation.[5] The first lease is entitled the “Business Premises Lease.” On its face the term of the lease was July 1, 1991 through June 30,2001. This lease covered two parcels of land generally referred to as Lot 5. The term of the second lease, entitled the “Stump Dump Lease,” is also July 1, 1991 through June 30, 2001. This lease covered the parcel of land known generally as Parcel B. Lot 5 is part of a larger parcel of land known as parcel A, which Theodore acquired from his father through inheritance in 1953. Theodore acquired parcel B in 1962. Theodore died in 1983. At that time, the title to the real estate passed to the trustee of the Trust. From 1981 to 1983, the corporation’s use and occupation of the real estate was exclusively as a lessee of Theodore. From 1983 to 2002, the corporation’s use and occupation of the real estate was exclusively as a lessee of the trustee of the Trust.
The 1991 leases each provide the corporation with an option to renew for an additional ten-year term. The same language appears in both leases:
The LESSEE is granted an option to renew said lease at the expiration of term of said lease for an additional period of ten (10) years at a rental to be agreed upon between the parties. In the event LESSOR and LESSEE cannot agree upon a rental, then the same shall be determined by arbitration of three (3) persons to whom said question shall be referred, one of such persons to be nominated by the LESSOR and one to be nominated by the LESSEE, and the third to be appointed in writing under the hands of the two so nominated before the reference is proceeded with, with the decision of any two (2) of the arbitrators shall be binding . . .
[Paragraph 14 of Business Premises lease; Paragraph 3 of Stump Dump lease.) The leases state that “the negotiation regarding a new rental amount will commence upon receipt of written notice from the lessee” of its intent to exercise the option to renew.
After acquiring the corporation, Clark had shown an interest in purchasing the property owned by the trust.[6] In fact, Clark had engaged in discussions to that effect with the beneficiaries of the Trust. In the spring of 2000, Clark had offered $300,000.00 for the real estate, $30,000 with a note for the balance of $270,000.00. In June of 2000, a draft purchase and sale agreement [Exhibit 31) was sent to Clark’s attorney by Russell B. Haddleton, attorney for the trustee. The draft did not include a description of the property. Clark did not sign the draft because there was a title issue which had not been resolved.
Prior to 2000, Clark had dealt with Carl Izzo as the bank officer in charge of the Nickerson trust account. However, in the late summer or early fall of 2000, Timothy Hannon (“Hannon”) became the trust officer assigned to the Nickerson trust account. Upon assuming his duties, Hannon visited the site of the plaintiffs business and introduced himself to Clark. Clark informed Hannon that he had been discussing purchase of the real estate with the beneficiaries. He told him that it was his understanding that the price of $300,000.00 had been agreed to by the beneficiaries. However, he also informed Hannon that there were title problems relating to the description of the property which needed to be resolved.
During this first visit, Clark gave Hannon a tour of the property. Clark then took Hannon to Lillian’s house where he met with her and Edmund J. Nicker-son (“Edmund”). Edmund was the son who handled Lillian’s financial affairs and was the principal contact with the trustee.
On September 15, 2000, Hannon placed a memo on file at the bank that described the oral agreement between Clark and the defendant beneficiaries. The memo states that consent of all parties would be needed, and that the price was low, regardless of the stump dump problems and permitting issues. On September 18, 2000, Hannon wrote to Edmund that Fleet had concerns with the purchase price that had been negotiated between the family and Clark. Hannon further stated that Fleet may require “those family members with an interest in the Trust to execute some type of hold harmless agreement prior to selling the property.” Exhibit 39. Edmund emailed Hannon on September 22, 2000 stating:
You know it amazes me the lawyer[s] are having such a problem with the sale to Steve. The land was bought by my father years ago. He had no problem with the deeds. Since that time 4 lots have been transferred out of the same property. The land has been surveyed at least 2 or 3 times. Bounds are in place. So I don’t know why these bounds can’t be used to make out a deed for the land that Steve wants to buy. If he is willing to accept the present bounds, what is the problem?
As for the selling price, the Family will be willing to sign whatever papers are needed to keep Fleet *284 harmless. You have been informed why it is important to expedite the sale. (Age and liability.)
In the fall of 2000, Clark spoke with Edmund to enlist his assistance in clearing the title issues. Edmund’s response was simple. There is no title problem. Clark and the bank should get going. As a result, Clark called Hannon and told him about the conversation with Edmund and requested a meeting of all concerned.
The corporation exercised its option to renew the leases by letters from the plaintiffs attorney, Hrant Russian (“Attorney Russian”), dated November 9, 2000. In each letter, Attorney Russian stated that notice was being given pursuant to the lease and the right to renew under the respective provisions of each leases. Each letter also contained the following statement, “... if no agreement is reached [as to the rental amount], then, we should proceed to [arbitration].” Exercise of the option to renew was timely.
Fleet’s attorney Russell Haddleton (“Attorney Haddleton”] secured a title examiner to confirm the record title. Questions had arisen concerning possible defects in the title because of boundaries. In an email from Edmund to Hannon on November 11, 2000, Edmund said that Hannon should not discuss renewing the leases with Clark until May of 2001 and that he thought Clark was buying the property. Edmund asked why Clark wanted to talk about leases when he was going to buy the property.
In December 2000, Attorney Haddleton was informed in writing that Clark would take title provided that the title search would confirm that there was a reasonable likelihood that good and clear title could be obtained through adverse possession. At this point in time, Attorney Russian sent a draft of a Purchase and Sale Agreement (“PSA”) to Attorney Haddleton. The next few months continued with further inquiries into the title of the trust property but the PSA was never signed.
In February 2001, because Fleet had not gone forward with the PSA, Attorney Russian informed Hannon that they should consider negotiating the lease renewals. Edmund continued to maintain his position that he did not want to discuss the lease renewals until May. Throughout April 2001, Attorney Russian, on behalf of Clark, continued to inquire about whether title could be cleared and whether Fleet could proceed with a closing for the purchase of the real estate. Hannon informed Edmund that Clark was pushing for the renewal of the leases, stating “[t]he reasons are twofold 1) he does not want to be without one, 2) it will help with an adverse possession claim by showing continuous use. Hannon proposed to Edmund a 5% yearly increase with a lump sum increase at the end of each five-year term. He also indicated that he had asked Attorney Russian to draft a purchase contract providing for an adverse possession claim if clear title could not be delivered. In August 2001, Clark’s attorney drafted two leases, for the Stump Dump and the Business Premises, and sent them to Hannon along with another copy of the Purchase and Sale Agreement.
On May 18, 2001, there was a meeting with Clark, Russian, Hannon, Edmund, Attorney Haddleton and the title examiner. The title issues were discussed and it was decided to assert ownership by adverse possession to the areas in dispute. Edmund agreed to assist in getting affidavits. Clark raised the issue of the leases. Hannon said that the leases would be extended for an additional ten-year period with a ten percent increase in rent. Following the meeting, the plaintiff purchased additional equipment for the business anticipating the sale. However, there was no further response regarding the affidavits Edmund said he would produce.
In the fall of 2001, the trustee retained George de Verges (“Attorney de Verges”) to represent it in the negotiations regarding the new leases. Throughout the end of 2001 and well into 2002, the attorneys exchanged numerous drafts of the proposed leases. The main issues of contention throughout this negotiation process were the rental value and the extent of the leasehold premises. The corporation wanted to increase the property within the leasehold and this was unacceptable to the trustee and beneficiaries.
By March 30, 2002, Edmund was getting progressively more impatient. In an email to Hannon on that date, he said:
It is about time that Steve and/or the Bank got off their a — and settle the land sale. My Mother is in a Nursing Home on the Cape. How long she will go on living is anyone’s guess. The sale should be made soon for obvious reasons.
Finally, on April 3, 2002, Hannon submitted the proposed leases to Fleet’s Real Estate Administration Committee (REAC) for approval. The committee voted to table the matter until its next meeting, and requested that Hannon obtain an appraisal to the fair rental value of the leasehold premises. Hannon ordered the appraisal and promptly notified the corporation of REAC’s decision. At trial, Clark testified that he had no knowledge that the leases had to be approved by a bank committee. However, Exhibit 80, a letter from Attorney de Verges to Attorney Russian indicated that the leases would need to be approved by people at Fleet with authority to bind the trustee. Hannon did not inform Clark that such approval was necessaiy or whether there was any uncertainty concerning approval of the lease terms proposed.
On April 11,2002, Lillian died. Clark called Hannon to ask what this meant with respect to the property. Hannon told him everything is now on hold. Thereafter, Fleet took the position that the trust would be *285 terminated and that, as trustee, its authority was to wind down the affairs of the trust and distribute the corpus to the beneficiaries. The beneficiaries have some dispute with this and point to language in the Trust suggesting that the children’s trusts would continue until each of their deaths.[7] However, there is also language in the same section of the Trust providing that three of the grantor’s children (Theodora, Edmund, and Diana) “may, from time to time, by notice in writing to the Trustee, request distributions of principal, including all thereof.” At all times the trustee maintained the sole discretion whether to make such distributions or not. Fleet decided to exercise its discretion, make distributions and terminate the trust.
At Lillian’s memorial service in May 2002, Clark talked to Edmund about buying the property. Edmund told Clark that he would accept $200,000 but the sale had to be quick and the title taken “as is.” Edmund made it clear that one contingency was that his brother Kenneth Nickerson (“Kenneth”) would continue to occupy his farm located within Lot 5. He also indicated to Clark that if the sale was not quick, he was inclined to give the property to the Town of Chatham. Ten or more weeks elapsed from the time of this conversation. Clark never brought Edmund a formal offer to purchase.
In May of2002, Anthony Bridgewater, another tenant of the trustee, contacted Fleet about a leaky roof in his building. Fleet told Mr. Bridgewater to get an estimate. The estimate came in at $15,000. Fleet stated that the bank did not want to be involved and that the property was being sold to the corporation. Mr. Bridgewater then met with Clark who indicated that the corporation was also not interested in fixing the leaky roof. Later in the month, Mr. Bridgewater learned from Kenneth that the beneficiaries were negotiating with Clark to sell him the property for $200,000. Kenneth indicated that he was concerned that Clark would want to take the $15,000 to fix the roof out of the $200,000 sale price. After learning that the property was approximately 30 acres, Mr. Bridgewater offered to buy it for “$400,000, straight away.”
Mr. Bridgewater took copies of the 1991 leases to his attorney Joseph D’Elia (“Attorney D’Elia”) who informed Bridgewater that the right of first refusal had expired with the 1991 leases. Attorney D’Elia drafted a purchase and sale agreement for Mr. Bridgewater and his wife, Barbara, (collectively, “the Bridgewater’s”) purchase of the trust property. It was signed on May 30, 2002. The agreement called for a cash sale, with no contingencies. The Bridgewater’s were willing to take the title “as is.”
Prior to signing the agreement, Edmund had contacted Hannon to inform him of the Bridgewater offer. Hannon told Edmund that Fleet would not be getting involved and that the beneficiaries should handle the matter themselves. Edmund was not aware that Hannon had told Clark that all of the terms and conditions of the 1991 leases would continue while the new leases were being negotiated. Edmund asked Bridgewater’s attorney.AttorneyD’Eliaabouttheright offirstrefusal, and D’Elia told him thatit had expired.
After the purchase and sale agreement was signed, Clark contacted Mr. Bridgewater to find out what was going on. They agreed to meet on June 2, 2002 at the corporation’s office. Mr. Bridgewater told Clark that he and his wife were buying the property for $400,000 “as is” and that the agreement was already signed. Bridgewater also told Clark that the closing would happen as soon as the money arrived from England and the beneficiaries received a deed from the trustee. On July 9, 2002, a representative of Fleet delivered the deed to Edmund. The closing between the beneficiaries and the Bridgewater’s occurred the next day, July 10, 2002. The deeds were recorded the same day. Thereafter, the plaintiff brought this action.
After the closing, the Bridgewater’s began discussions with the corporation regarding the new leases. The Bridgewater’s were prepared to accept the leases that had previously been negotiated with Fleet, with two exceptions. First, they wanted the corporation to remove the debris that had accumulated on the stump dump over the years. Second, the Bridgewater’s wanted to be dismissed from the instant litigation, with prejudice. The new leases were executed in January 2003. A stipulation of dismissal with prejudice was executed at the same time.
In March of 2005, the plaintiff filed a second amended complaint. The six counts against the defendants are as follows: (1) that Fleet breached the covenant of good faith and fair dealing and that the plaintiff suffered damages in regard to its rights under the option to renew the leases; (2) that the defendant beneficiaries breached the covenant of good faith and fair dealing and that the plaintiff suffered damages in regard to its rights under the option to renew the leases; (3) that Fleet breached the covenant of good faith and fair dealing and that the plaintiff suffered damages in regard to its rights under its right of first refusal; (4) that the defendant beneficiaries breached the covenant of good faith and fair dealing and that the plaintiff suffered damages under its right of first refusal; (5) that Fleet’s conduct constituted unfair and deceptive acts or practices, in violation of G.L.c. 93A; and (6) that the conduct of the beneficiaries constituted unfair and deceptive acts or practices, in violation of G.L.c. 93A.

DISCUSSION

I. Implied Covenant of Good Faith and Fair Dealing

Every contract in Massachusetts is subject, to some extent, to an implied covenant of good faith and fair dealing. Anthony’s Pier Four v. HBC Associates. 411 *286 Mass. 451, 471-72 (1991). This means that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Druker v. Roland Wm. Jutras Assoc., 370 Mass. 383, 385 (1976). The concept of good faith and fair dealing in any one context is shaped by the particulars of the contractual relationship from which the implied covenant derives. Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367, 385 (2005). The scope of the covenant is only as broad as the contract that governs that relationship. Id. The implied covenant of good faith and fair dealing may not be invoked to create rights and duties not otherwise provided for in the existing contractual relationship. Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385 (2004).
The contracts at issue here are the two leases executed in 1991 which governed the plaintiffs use of the stump dump and the business premises on Mill Hill Road. The plaintiff alleges that the defendants breached the implied covenants arising out of the leases by failing to honor the option to renew and right of first refusal provisions contained therein.

A. The Option to Renew

An option to renew contemplates the execution of a new lease, a process that may introduce new terms and conditions on which the parties must agree or there will be no new lease. See HLM Realty Corp. v. Morreale, 394 Mass. 714, 715-16 (1985); Ingram v. Sonitrol Security Sys. of Worcester, Inc., 11 Mass.App.Ct. 754, 756-57 (1981); Anderson v. Lissandri, 19 Mass.App.Ct. 191, 194-95 (1985). In this instance, the plaintiff through it’s attorney, notified Fleet in writing that it intended to renew the leases. This right was exercised in November 2000 and the leases were not due to expire until June 2001. Throughout this time period, and into 2002, the parties exchanged five different versions of new leases but were never able to agree on all of the new terms and conditions.
The renewal process was complicated by various factors. For example, prior to exercising the option to renew, Clark had begun the process of negotiating the purchase of the property. Edmund, acting as the representative of the beneficiaries, made it clear to Hannon that he should focus on the sale of the property rather than the lease renewals. The purchase of the property was delayed while the parties tried to ascertain whether Clark would be able to take the property with good and clear title or whether clear title would require an action to clear title by adverse possession. It was not until April of 2002 that Hannon submitted the proposed leases to the bank committee and recommended that the committee approve them. The committee rejected the proposed leases and asked that an appraisal be done before they would reconsider the matter. The delay in submitting the proposed lease renewals was fatal to the plaintiffs securing the new leases since Lillian Nickerson’s death precipitated Fleet’s decision to distribute the trust property without effectuating the lease renewals.
The plaintiffs claim that the Trust beneficiaries breached the implied covenant of good faith and fair dealing in regard to the option to renew is without merit. It was Fleet, acting as trustee, who was in a contractual relationship with the plaintiff, not the Trust beneficiaries. It is true that Edmund told Fleet to focus on the sale of the property, rather than the lease renewals; however, this did not indicate any ill will on the part of all of the beneficiaries. To be fair, the beneficiaries made it clear that they wanted to sell the land to the plaintiff and were willing to hold Fleet harmless to make it happen.
However, with regard to Fleet the facts support the plaintiffs contention that Fleet breached the covenant of good faith and fair dealing with respect to lease renewals. First, the plaintiff timely exercised the option to renew the leases. In February 2001, Hannon proposed a five percent increase in the rental price as part of the lease renewal negotiations. Clark’s attorney first sent drafts of the leases to Hannon in August 2001. Clark’s signature on the February 2002 drafts clearly evidence his intent and willingness to renew the leases. The facts also make it clear that even though negotiations for the purchase and sale of the property were under way, the plaintiff was tired of the delay and wanted to renew the leases to speed up the process and to protect his interest in the property. Furthermore, the April 4, 2004 letter written by Attorney de Verges demonstrates that Clark had good cause to refuse to sign a purchase and sale agreement. The plaintiff exercised its option to renew in accordance with the terms of the leases and acted in a diligent and timely manner, such that it’s intentions to renew the leases were made clear to the defendants. Fleet on the other hand, dragged its feet throughout the lease renewal process and failed to act in good faith toward the plaintiff.
The option to renew provisions contemplated the situation that occurred, namely that the parties could not agree on the terms and conditions of the new leases. The remedy provided was that in the event an agreement could not be reached, the parties could submit the matter to arbitration. The plaintiffs notice clearly stated that the plaintiff was willing to arbitrate and expected to do so if terms were not agreeable. As trustee, Fleet had the obligation to honor the terms of the lease and submit disputes to arbitration. Fleet clearly did not pursue the lease renewals as expeditiously as required because the desire to sell the trust property was paramount. Fleet, acting as trustee, breached the terms of the leases in failing to effectuate renewals within a reasonable period of time. The death *287 of Lillian did not relieve Fleet of its obligations to the plaintiff under the leases.
Therefore, Fleet breached the covenant of good faith and fair dealing by failing to renew the two leases.

B. The Right of First Refusal

The leases gave the plaintiff “the right of first refusal to purchase the entire leasehold premises at a price equal to any bona fide offer received by the LESSOR.”[8] There are numerous arguments in this case as to whether or not the right of first refusal was still valid at the time that the property was sold to the Bridgewaters. First, the defendants argue that the right of first refusal expired when the 1991 leases terminated. The plain language of the lease provisions containing the right of first refusal does indicate that the right only existed until the leases expired. The provisions state, “[S]aid right of first refusal to expire upon the termination of this lease.” As of June 30, 2001, both of the leases had terminated.
The plaintiff argues that Hannon told it that the terms and conditions of the leases, including the right of first refusal, would be extended until the new leases had been negotiated. Fleet argues that whether or not such representations were made is irrelevant because any such promise would be unenforceable because it does not comply with the Statute of Frauds. See Schwanbeck v. Federal Mogul Corp., 412 Mass. 703, 709 (1992). In response, the plaintiff points out that neither of the leases included provisions requiring that any modification be in writing. Oral modifications which affect time, tolling and price establish a substitute performance rather than a substitute contract and the Statute of Frauds does not render the contract unenforceable. McKinley Investment, Inc. v. Middleborough Land, LLC, 62 Mass.App.Ct. 616, 619-21 (2004). Here the oral modification affected the time period of the lease.
In addition, a tenant who holds over at will after the expiration of a written lease holds the premises as a tenant at will according to the terms of the written lease, in the absence of a new agreement. Boudreau v. Johnson, 241 Mass. 12, 16 (1922). Here, the plaintiff had timely exercised its option to renew and relied to its detriment on Hannon’s representation that the terms and conditions of the old leases would continue until the new leases were executed. This Court finds that both the plaintiff and Fleet understood that the terms of the 1991 leases would remain in effect until they could reach an agreement on the new leases or until they could finalize a purchase and sale agreement.
Upon notice of a bona fide offer to purchase, the right of first refusal ripens into an option to purchase the property at the price and otherwise on the terms stated in the offer. Christian v. Edelin, Civil No. 04-P-1391 (Mass.App.Ct., March 16, 2006), citing Frostar Corp. v. Malloy, 63 Mass.App.Ct. 96, 103 (2005). Fleet argues that it never received a bona fide offer to purchase the property from the Bridgewaters. Technically, this may be true because the Bridgewaters made the offer to Edmund and Kenneth rather than directly to the bank. “A third party offer is bona fide if it was made ‘honestly and with serious intent,’ that is, if the offeror genuinely intends to bind itself to pay the offered price.” Mucci v. Brockton Bocee Club, Inc., 19 Mass.App.Ct. 155, 158 (1985). Here, the Bridgewaters offer to purchase was honest and with serious intent as indicated by the offer to pay “$400,000 straight away.” Even though Fleet did not receive the offer directly, after the beneficiaries received the offer to purchase, they did inform Fleet of it and asked the bank to take care of the sale. Fleet refused to be involved. Neither Fleet nor the defendant beneficiaries informed the plaintiff of the Bridgewater’s offer to purchase. However, where notice of the receipt of a bona fide offer to purchase triggers the right, a completed sale to a third party without prior notice of the offer to the holder of the right does not extinguish the right. Town of Sudbury v. Scott, 439 Mass. 288, 297-98 (2003), citing Stone v. W.E. Aubuchon Co., 29 Mass.App.Ct 523, 526 (1990).
The holder is entitled to specific performance of the option as to a subsequent owner who purchased with notice of the holder’s right of first refusal. Id. In this case, the Bridgewaters had notice of the plaintiffs right of first refusal. They were given copies of the 1991 leases and took them to Attorney D’Elia to see if the right of first refusal was still valid. Attorney D’Elia informed the Bridgewaters that the right of first refusal had expired. This court notes that Attorney D’Elia made this representation based solely on the plain language of the leases and without any other information. “(A]n option may be exercised only in strict compliance with its terms.” Stone, 29 Mass.App.Ct. at 527. If the holder of the right does not receive the notice to which he is entitled under the instrument creating the right, then any specified period within which the option must be exercised does not start to run. Id. However, circumstances may place the holder on constructive notice that his right of first refusal has been implicated, in which case the holder must investigate and exercise his option within a reasonable period of time. See id. at 526-27.
Here, the plaintiff received constructive notice of the Bridgewater’s offer. This is evident because Clark called Bridgewater in June 2002, before the closing or the delivery of the deed, and learned that the Bridgewaters had already signed a purchase and sale agreement. According to the terms of the leases, “the LESSEE shall have thirty (30) days from receipt [of notice of the bona fide offer] to notify LESSOR of its intent to exercise its right of first refusal. . . LESSEE *288 shall then have sixty (60) days subsequent thereto in which to purchase said property in accordance with the terms of any said bona-fide offer.” After receiving constructive notice, the plaintiff never exercised his right of first refusal. In fact, after initially including the Bridgewaters in this lawsuit, the plaintiff eventually entered into new leases with the Bridgewaters and dismissed with prejudice any claims it had against them. The plaintiff failed to exercise its right of first refusal; it cannot now claim that the defendants breached the implied covenants of good faith and fair dealing and caused the corporation damages under that right.

II. G.L.c. 93A

The plaintiff also alleges that the defendants engaged in unfair and deceptive acts or practices in violation of G.L.c. 93A. Chapter 93A§2(a) provides that “unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.” Not every unlawful act is automatically an unfair or deceptive one. Mechanics Nat’l Bank v. Killeen, 377 Mass. 100, 109 (1979). Rather the act must be unethical, immoral, oppressive, or unscrupulous. Levings v. Forbes & Wallace, Inc. 8 Mass.App.Ct. 498, 504 (1979). A negligent act, standing by itself does not give rise to a claim under G.L.c. 93A. Squeri v. McCarrick, 32 Mass.App.Ct. 203, 207 (1992). Even a breach of contract alone does not amount to an unfair act or practice under Chapter 93A. Massachusetts Employers Ins. Exchange v. Propac-Mass., Inc. 420 Mass 39, 43 (1995).
A violation of a provision in a lease is insufficient in and of itself to satisfy the unfairness requirement. Atkinson v. Rosenthal, 33 Mass.App.Ct. 219, 226 (1992). In Atkinson the court held that a failure to perform obligations under a written commercial lease, even though deliberate and for reasons of self-interest, did not form a basis for asserting a claim under G.L.c. 93A where there was no consistent pattern of breach of contract being used to obtain advantage for the party committing the breach in relation to the other party. Finally, it is not unethical, immoral, oppressive or unscrupulous — and therefore not unfair or deceptive — to real off incomplete and imperfect negotiations of a commercial agreement. Pappas Industrial Parks, Inc. v. Psarros, 24 Mass.App.Ct. 596, 600 (1987).
Chapter 93A affords recovery to “(a]ny person who engages in the conduct of any trade or commerce and who suffers any loss ... as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice.” Chapter 93A is not available where the transaction is strictly private in nature and is no way undertaken in the ordinary course of a trade or business. Lantner v. Carson, 374 Mass. 606, 608 (1978). In this case, the defendant beneficiaries were not engaged in business activities for the purpose of the statute. In addition, no G.L.c. 93A claim can be maintained if no commercial relationship ever existed between the parties. Steele, 46 Mass.App.Ct. at 984. The actions of a trustee, executor, or administrator in executing fiduciary responsibilities do not constitute trade or commerce or involve the requisite commercial marketplace transactions to bring them within chapter 93A. Id. Fleet, acting as trustee of Theodore W. Nickerson’s estate, did not act in a business context as contemplated by G.L.c. 93A. The plaintiffs claims against both defendants for violation of G.L.c. 93A are without merit.

ORDER

For the reasons stated above, it is ORDERED that judgment shall enter declaring that:
1. Fleet breached the lease agreements with the plaintiff concerning the options to renew and also the implied covenant of good faith and fair dealing by its unreasonable delay in effectuating a renewal of the leases after timely notice of the plaintiffs intent to exercise the option was given and that the plaintiff suffered damages in regard to its right under the option to renew the leases.
2. There was no breach of the covenant of good faith and fair dealing by the Trust beneficiaries in connection with the option to renew provisions.
3. There was no breach of the implied covenant by either defendant under the right of first refusal provision contained in the leases.
4. There was no violation of G.L.c. 93A by either defendant.
5. On the issue of damages for failure to honor the option to renew provision of the leases, the plaintiff is directed to submit an affidavit detailing the damages claimed. If the amount of damage is disputed by the defendant Fleet, the court will conduct a further hearing.

Clark was related to the Nickerson family through his mother.

Donald also sold land which had access via an easement over the property owned by the trust.

The leases were signed on June 17, 1993.

It appears from the proposed draft purchase and sale agreements that Clark intended to purchase the real estate in his own name rather than in the corporate name.

Article First paragraph (4) of the Trust. Exhibit # 28.

Stump Dump Lease, Paragraph 3; Business Premises Lease, Paragraph 14.